## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: SUNEDISON, INC. SECURITIES LITIGATION | ) ) ) ) ) Case No.  16-md-2742-PKC |

THIS DOCUMENT APPLIES TO:

| | |
|---|---|
| IN RE: SUNEDISON, INC. ERISA LITIGATION | ) ) ) ) ) Case No.  16-mc-2744-PKC |

## SECOND AMENDED CONSOLIDATED COMPLAINT
## FOR BREACH OF ERISA'S FIDUCIARY DUTIES

Plaintiffs Eric O'Day, Robert Linton, Lee Medina, and Gaurab Samanta ("Plaintiffs"),

individually, on behalf of the SunEdison, Inc. Retirement Savings Plan (the "Plan"), and on behalf

of all other similarly situated Plan participants and beneficiaries (the "Participants"), bring this

action in a derivative capacity against the below-named defendants (collectively "Defendants")

pursuant to §§ 404, 405, 409, and 502 of the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. §§ 1104, 1105, 1109, and 1132.[1]

## NATURE OF THE ACTION

1.     This case is about the abject failure of the SunEdison, Inc. ("SunEdison" or the

"Company") fiduciaries of the Plan, to protect the interests of Plan Participants in violation of

---

[1]     All allegations contained herein are based upon personal information as to Plaintiffs and the investigation of Plaintiffs' counsel, including, but not limited to a review of publicly filed documents, or upon information and belief, where indicated.  It is likely that, once discovery begins in earnest, the roles of additional persons or entities in the wrongdoing alleged below will be revealed and the wrongdoing itself will be further illuminated.  In that event, Plaintiffs will seek to amend this Complaint to add new parties and/or claims in accordance with the Federal Rules of Civil Procedure and this Court's rules.

Defendants' (defined below) and SunEdison's legal obligations under ERISA. Defendants and SunEdison breached the duties they owed to the Plan and Plaintiffs by, *inter alia*, retaining SunEdison's common stock (hereafter, "SunEdison Stock" or "Company Stock") as an investment option under the Plan, when a reasonable fiduciary using the "care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters" would have done otherwise. *See* ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

2.      Specifically, and as shown in greater detail below, Defendants permitted the Plan to continue to offer SunEdison Stock as an investment option to Plan Participants even after Defendants knew or should have known that during the Relevant Period — between July 20, 2015 and April 21, 2016 — that: (i) the Company was in extremely poor financial condition and (ii) the Company faced equally poor long-term prospects, making it an imprudent retirement investment for the Plan. Defendants and SunEdison were empowered, as fiduciaries, to remove SunEdison Stock from the Plan's investment options, yet they failed to do that, or to act in any way to protect the interests of the Plan or its Participants, in violation of their legal obligations under ERISA.

3.      Throughout the Relevant Time Period, defendants Ahmad R. Chatila ("Chatila") and Brian A. Wuebbels ("Wuebbels") misrepresented, *inter alia*, the Company's access to capital and cash reserves, progress of certain energy products to be run by SunEdison's yield company subsidiaries ("YieldCos"), TerraForm Power, Inc. ("TERP") and TerraForm Global, Inc. ("Global"), and the financial contribution of a blizzard of acquisitions to SunEdison's bottom line. In order to carry out this scheme, Chatila and Wuebbels filed documents setting forth false information with the Securities and Exchange Commission ("SEC"), gave false information to third parties with which SunEdison was doing business, and misstated the Company's prospects in earnings calls and investor presentations. When SunEdison's liquidity needs became

2

particularly acute, defendants even went so far as to use their voting control over the YieldCos to replace the conflicts committees of the YieldCos with new individuals, including defendant Peter Blackmore ("Blackmore") who would acquiesce to the looting of the corporate coffers of Global, Inc.  This looting was done in order to satisfy ill-advised debt obligations that the Company had assumed in order to finance the reckless acquisition spree spearheaded by Chatila in his capacity as CEO.

4.      Separate and apart from defendant Chatila's wrongdoing, defendant Wuebbels' wrongdoing is particularly acute because he sat on the SunEdison Investment Committee (defined below), which was responsible for investing Plan assets in SunEdison Stock, even though the Company's employees were counting on those funds for retirement.  At the same time that defendant Wuebbels was misleading SunEdison shareholders, the SEC, and other companies with which SunEdison was doing business, he was also directing employee-class members' money into a fund that purchased SunEdison Stock.  There were so many red flags and warning signs that came to light during SunEdison's demise that defendant Wuebbels and the other members of the Investment Committee could not have possibly thought that SunEdison Stock was a prudent investment option.  As a result of their imprudence, the Plan Participants lost their hard-earned money.

5.      The Investment Committee members however, were not the only people at SunEdison who were at fault.  Each member of the Company's Board of Directors (the "SunEdison Board") had a responsibility to appoint prudent individuals to the Investment Committee, monitor their performance, and keep them apprised of facts and circumstances that would impact the performance of SunEdison Stock.  Each defendant on SunEdison's Board had actual knowledge of the Company's poor performance outlook, and nevertheless failed to take action to have the

Investment Committee cease investment of Plan Assets in SunEdison Stock, or otherwise appoint

Investment Committee members who would.

6.     In the Declaration of Patrick M. Cook ("Cook") filed on the date that SunEdison

petitioned for relief under the Bankruptcy Code, Cook, the Company's Vice President of Capital

Markets and Global Finance, attested to the truth of a chart detailing the "pivotal events preceding

the filing of" the bankruptcy petition:



7.     Defendants had knowledge of the facts, circumstances, risks, and dangers posed by

many of these events, yet did nothing to safeguard the interest of the Plan Participants.  As a result,

the Plan Participants' investments in SunEdison Stock have been completely wiped out, as there

will not be any distribution of assets to equity holders.  As explained in the Debtors' Omnibus

Response to Requests to Appoint an Official Committee of Equity Security Holders filed with the

Bankruptcy Court on June 2, 2016:

> The Debtors and their advisors are fully aware of the financial hardship suffered by
> SunEdison, Inc. equity holders as a result of the present situation.  Recognizing that
> hardship, the Debtors and their advisors have been taking all appropriate steps to
> maximize the value of the estate for all stakeholders, including equity holders, and
> intend to continue doing so.  There is nothing the Debtors desire more than to be
> able to pay all creditors and return value to equity holders.  Unfortunately, the facts

of this situation lead to the inevitable conclusion that this is entirely unlikely. Accordingly, in response to certain requests and this Court's Order to Show Cause Why an Official Committee of Equity Security Holders Should Not Be Appointed in these Chapter 11 Cases [Doc. No. 356] ("Order to Show Cause"), the Debtors respectfully submit that such "extraordinary relief" is not appropriate here.  Simply put, there is no basis to conclude that there will be any recovery – let alone a "meaningful" one – for equity holders.  To the contrary, numerous indicators demonstrate that many of the Debtors' creditors will themselves receive only a fractional recovery on their claims, thereby precluding any recovery for equity under the absolute priority rule."

8.      The thrust of Plaintiffs' allegations under Counts I (breach of the duty of prudence) and II (breach of the duty of loyalty) is that Defendants allowed the investment of the Plan's assets in SunEdison Stock throughout the Relevant Period despite the fact that Defendants knew or should have known at least by the beginning of the Relevant Period that that investment was imprudent as a retirement vehicle for the Plan.

9.      SunEdison Stock was also imprudent during the Relevant Period in light of the circumstances demonstrating SunEdison's perilous financial condition including, among other things and as explained in detail below, a sea-change in the basic risk profile and business prospects of SunEdison.

## JURISDICTION AND VENUE

10.      *Subject Matter Jurisdiction.*  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11.      *Personal Jurisdiction.*  This Court has personal jurisdiction over all Defendants because they are all residents of the United States and ERISA provides for nation-wide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

12.      *Venue.*  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  This case was filed in the Eastern District of Missouri, where venue was proper because the Plan is administered in such District, some or all of the fiduciary breaches for which

relief is sought occurred in such District, and one or more defendants reside or may be found in such District.  This action was transferred to this District by the MDL Panel in response to a motion filed by the court-appointed lead plaintiffs in a related securities fraud action.

### PARTIES

**Plaintiffs**

      13.    ***Plaintiff Eric O'Day*** ("O'Day") is a former SunEdison employee and "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  During the Relevant Period, Plaintiff O'Day held shares of SunEdison Stock through his individual Plan account, and suffered losses as a result of investing his retirement Plan assets in SunEdison Stock.  Specifically, during the Relevant Period, the value of SunEdison shares in Plaintiff O'Day's account diminished as a result of Defendants' and SunEdison's breaches of fiduciary duty described herein.  Plaintiff O'Day is no different, in all material respects, than the thousands of other SunEdison employees who entrusted the Defendant-fiduciaries with their retirement savings.

      14.    ***Plaintiff Robert Linton*** ("Linton") is a former SunEdison employee and "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  During the Relevant Period, Plaintiff Linton held shares of SunEdison Stock through his individual Plan account, and suffered losses as a result of investing his retirement Plan assets in SunEdison Stock.  Specifically, during the Relevant Period, the value of SunEdison shares in Plaintiff Linton's account diminished as a result of Defendants' and SunEdison's breaches of fiduciary duty described herein.  Plaintiff Linton is no different, in all material respects, than the thousands of other SunEdison employees who entrusted the Defendant-fiduciaries with their retirement savings.

      15.    ***Plaintiff Lee Medina*** ("Medina") is a former SunEdison employee and "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  During the Relevant Period, Plaintiff Medina held shares of SunEdison Stock through his individual Plan

6

account, and suffered losses as a result of investing his retirement Plan assets in SunEdison Stock. Specifically, during the Relevant Period, the value of SunEdison shares in Plaintiff Medina's account diminished as a result of Defendants' and SunEdison's breaches of fiduciary duty described herein.  Plaintiff Medina is no different, in all material respects, than the thousands of other SunEdison employees who entrusted the Defendant-fiduciaries with their retirement savings.

16.     ***Plaintiff Gaurab Samanta*** ("Samanta") is a former SunEdison employee and "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  During the Relevant Period, Plaintiff Samanta held shares of SunEdison Stock through his individual Plan account, and suffered losses as a result of investing his retirement Plan assets in SunEdison Stock. Specifically, during the Relevant Period, the value of SunEdison shares in Plaintiff Samanta's account diminished as a result of Defendants' and SunEdison's breaches of fiduciary duty described herein.  Plaintiff Samanta is no different, in all material respects, than the thousands of other SunEdison employees who entrusted the Defendant-fiduciaries with their retirement savings.

**Director Defendants**

17.     ***Defendant Chatila*** served as the President, Chief Executive Officer ("CEO") and a Director of SunEdison, a Director and Chairman of the Board of Directors of TERP, and a Director and Chairman of the Board of Directors of Global.  Chatila became President and CEO of SunEdison and a member of the SunEdison Board in March 2009.  Chatila oversaw the acquisition of SunEdison LLC in 2009 and, during the Relevant Period, developed SunEdison's solar strategy.  On November 20, 2015, Chatila resigned as Chairman of the Board, and on May 26, 2016, as Director of both TERP and Global.  On June 22, 2016, Chatila resigned as President and CEO of SunEdison.  During the Relevant Period, Chatila possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control

with respect to the management of the Plan's assets through his appointment of other Plan fiduciaries.

18.     ***Defendant Emmanuel T. Hernandez*** ("Hernandez") has served as Chairman of the SunEdison Board since January 2013 and as a member of the SunEdison Board since 2009. He served as Executive Chairman of the Board beginning in November 2015.   From April 2005 to November 2008, he served as the CFO of SunPower Corporation.  Hernandez retired as CFO of SunPower in November 2008, but continued in a transition role at SunPower until January 2009. The adult son of Hernandez was employed by the Company during 2014 in the capacity of a software quality assurance engineer. The Company paid Hernandez's son $136,837 in 2014. Hernandez's son has been employed with the Company since 2011.  During the Relevant Period, Hernandez possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets through his appointment of other Plan fiduciaries.

19.     ***Defendant Antonio R. Alvarez*** ("Alvarez") has served as a director of SunEdison since 2012.   During the Relevant Period, Alvarez also served as a member of SunEdison's Compensation Committee.  Among other documents, Alvarez signed the September 9, 2013 Shelf Registration Statement[2] and was a director of SunEdison on August 18, 2015, the date of the Preferred Offering.  During the Relevant Period, Alvarez possessed discretionary authority or

---

[2]     On August 17, 2015, SunEdison announced that it intended to conduct an offering of 500,000 shares of convertible preferred securities to raise funds "for general corporate purposes," including "funding working capital and growth initiatives." (defined above as the "Preferred Offering").  Just one day later, on August 18, the Company announced that it had increased the Preferred Offering to 650,000 shares, priced at $1,000 per share, to raise $650 million in total. That day, SunEdison filed a prospectus supplement (the "Offering Prospectus") to its September 9, 2013 shelf registration statement filed on Form S-3 (the "Shelf Registration," and together with the Preferred Offering Prospectus, the "Offering Documents") for the offering of series A perpetual convertible preferred stock ("Preferred Stock").

discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets through his appointment of other Plan fiduciaries.

20.     **Defendant Peter Blackmore** ("Blackmore") was, at all relevant times, a director of SunEdison.  Blackmore became a director of MEMC Electronic Materials, Inc. ("MEMC") the former name of the SunEdison parent company, in February 2006.  He served as a director of SunEdison from February 2006 until November 2015 when he resigned from the Company's Board.  During the Relevant Period, Blackmore served as Chairman of SunEdison's Nominating and Corporate Governance Committee and a member of SunEdison's Compensation and Finance and Investment Committees.  After resigning from SunEdison in November 2015, Blackmore served as Chairman of the Board of TERP and Global as of November 2015 and served as Chairman of TERP and Global's Corporate Governance and Conflicts Committee (the "Conflicts Committee") as of November 2015.  Blackmore signed the September 9, 2013 Shelf Registration Statement and was a director of SunEdison on August 18, 2015, the date of the Preferred Offering. As a member of Global's Conflicts Committee, Blackmore authorized the filing of the Global Complaint against SunEdison.  During the Relevant Period, Blackmore possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets through his appointment of other Plan fiduciaries.

21.     **Defendant Clayton Daley** ("Daley") was, at all relevant times, a director of SunEdison.  Daley joined SunEdison as member of the SunEdison Board on August 1, 2014. Daley also served as a member of SunEdison's Audit Committee and Finance and Investment Committee.  Daley was a director of SunEdison on August 18, 2015, the date of the Preferred

Offering.  During the Relevant Period, Daley possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets through his appointment of other Plan fiduciaries.

22.     ***Defendant Georganne Proctor*** ("Proctor") was, at all relevant times, a director of SunEdison.  Proctor joined SunEdison's Board on October 30, 2013. Proctor also served on SunEdison's Audit Committee, and, in June 2014, was appointed Chairman of SunEdison's Audit Committee, a position which she held throughout the end of the Relevant Period.  Proctor was a director of SunEdison on August 18, 2015, the date of the Preferred Offering.  During the Relevant Period, Proctor possessed discretionary authority or discretionary responsibility in the administration of the Plan, and she exercised authority or control with respect to the management of the Plan's assets through his appointment of other Plan fiduciaries.

23.     ***Defendant Steven Tesoriere*** ("Tesoriere") was, at all relevant times, a director of SunEdison.  In October 2012, Tesoriere was appointed to serve as a director of the Board of MEMC, and served on the SunEdison Board from that time until his resignation on January 19, 2016.  Tesoriere also served as a member of SunEdison's Audit Committee and served as the Chairman of the Company's Finance and Investment Committee.  Tesoriere also served as a TERP director beginning in May 2014, a Global director beginning in August 2015, and served as a member of the YieldCos' Audit Committees until he resigned as director of the YieldCos on November 20, 2015.  Tesoriere signed the September 9, 2013 Shelf Registration Statement and was a director of SunEdison on August 18, 2015, the date of the Preferred Offering.  During the Relevant Period, Tesoriere possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets through his appointment of other Plan fiduciaries.

24.    ***Defendant James Williams*** ("Williams") was, at all relevant times, a director of SunEdison.  Williams served as a director of MEMC beginning in 2003 and thereafter served as a director of SunEdison after the Company changes its name.  Williams also served as Chairman of SunEdison's Compensation Committee and as a member of SunEdison's Nominating and Corporate Governance Committee.  Williams signed the September 9, 2013 Shelf Registration Statement and was a director of SunEdison on August 18, 2015, the date of the Preferred Offering.  During the Relevant Period, Williams possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets through his appointment of other Plan fiduciaries.

25.    ***Defendant Randy Zwirn*** ("Zwirn") was, at all relevant times, a director of SunEdison.  Zwirn joined MEMC's Board of Directors and served as a director beginning in March 2013 and thereafter served as a director of SunEdison.  Zwirn also served as a member of SunEdison's Finance and Investment Committee and Nominating and Corporate Governance Committee.  Zwirn signed the September 9, 2013 Shelf Registration Statement and was a director of SunEdison on August 18, 2015, the date of the Preferred Offering.  During the Relevant Period, Zwirn possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets through his appointment of other Plan fiduciaries.

**Investment Committee Defendants**

26.    ***Defendant the Investment Committee*** ("Investment Committee").  The Investment Committee is comprised of certain Company employees/officers appointed by the SunEdison Board on behalf of the Company as Plan Administrator.  The Investment Committee is charged

with the day-to-day management and administration of the Plan and/or management and disposition of the Plan's assets.

27.     Pursuant to Article XVIII, Section 18.1 of the MEMC/SunEdison Retirement Savings Plan:

> The Investment Committee may establish one or more Pooled Investment Funds, with different investment objectives, from time to time; and establish procedures consistent with the Plan permitting Participants to direct investment of all or a designated portion of their Individual Accounts among such Pooled Investment Funds.  The Investment Committee also may designate Segregated Investment Funds in which Participants may direct investment of all or a designated portion of their Individual Accounts.  […]

*See* Wheeler-104b_0004597.

28.     ***Defendant Wuebbels*** was, at all relevant times, the Executive Vice President, Chief Administrative Officer ("CAO"), and CFO of SunEdison.  Wuebbels is also a member of the Investment Committee.  Beginning his tenure at SunEdison in 2007, Wuebbels held numerous positions before being appointed Executive Vice President and CFO of SunEdison in May 2012 and its CAO in December 2014.  Wuebbels served as TERP's and Global's director and was also appointed as the CEO and President of TERP and Global in November 2015.  On March 30, 2016, Wuebbels resigned as TERP's and Global's President and CEO.  On May 10, 2016, SunEdison announced that Wuebbels would be resigning as CFO and CAO of SunEdison, with his last day of employment being on June 9, 2016.  During the Relevant Period, Wuebbels possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets through his appointment of other Plan fiduciaries.

29.     ***Defendant Phelps Morris*** ("Morris") was the Vice President of Investor Relations at the Company.  Morris is also a member of the Investment Committee.  During the Relevant

Period, Morris possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets through his appointment of other Plan fiduciaries.

30.     **Defendant Matthew Herzberg** ("Herzberg") joined SunEdison as Senior Vice President and Chief Human Resource Officer in March 2011.  Herzberg is also a member of the Investment Committee.  During the Relevant Period, Herzberg possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets through his appointment of other Plan fiduciaries.

31.     **Defendant Matt Martin** ("Martin") was a Senior Compensation and Benefits Leader at the Company.  Martin is also a member of the Investment Committee.  During the Relevant Period, Martin possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets through his appointment of other Plan fiduciaries.

32.     **Defendant James Welsh** ("Welsh") was, at all relevant times, SunEdison's Global Benefits Manager.  Welsh is also a member of the Investment Committee.  During the Relevant Period, Welsh possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets through his appointment of other Plan fiduciaries.

33.     **Defendants John Does 1-10** were persons who had the duty and responsibility to properly appoint, monitor and inform the members of the Investment Committee and/or other persons who exercised day-to-day responsibility for the management and administration of the Plan and its assets.  John Does 1–10 failed to properly monitor and inform such persons in that

these defendants failed to adequately inform such persons about the true financial and operating condition of the Company or, alternatively, these defendants did adequately inform such persons of the true financial and operating condition of the Company (including the financial and operating problems being experienced by SunEdison during the Relevant Period identified herein), but nonetheless continued to allow such persons to offer SunEdison Stock as investment options when SunEdison Stock was not a prudent investment for the Plan Participants' retirement accounts under the Plan.

34.    Instead of delegating fiduciary duties for the Plan to outside service providers, SunEdison internalized the Plan's fiduciary functions and appointed its officers and senior executives as Plan fiduciaries.  As such, all of these officers and senior executives owed a fiduciary duty of loyalty to act solely in the interests of the Plan and its Participants.

**Non-Party SunEdison**

35.    SunEdison, Inc., a solar startup that was acquired by semiconductor company MEMC Electronic Materials, Inc. in 2009 for $200 million, is a Delaware corporation headquartered at 13736 Riverport Dr., Maryland Heights, Missouri.  On May 30, 2013, MEMC Electronic Materials, Inc. changed the entire conglomerate's name to SunEdison, and the Company subsequently changed its business model to focus on clean energy.

36.    According to the Plan's annual report on the Form 11-K for the fiscal year ended December 31, 2014, filed with the SEC on June 29, 2015 ("2014 Form 11-K"), SunEdison is the sponsor of the Plan.  *Id.* at 4.

37.    At all relevant times, SunEdison acted with respect to the Plan's assets through its officers and employees and members of the SunEdison Board, who performed Plan-related fiduciary functions in the course and scope of their employment and/or affiliation with SunEdison.

14

Upon information and belief, the SunEdison Board and/or the Investment Committee members are responsible for reviewing the performance of any Plan fiduciary or other person(s) or entity(ies) to whom fiduciary duties have been delegated or allocated with respect to the Plan's assets.

38.     SunEdison is not named as a defendant in this Consolidated Complaint because it petitioned for relief under the United States Bankruptcy Code on April 21, 2016, and is therefore subject to the automatic stay provision set forth at 11 U.S.C. § 362.  SunEdison was named in Plaintiffs' earlier complaints, which were filed before that date, and Plaintiffs reserve any and all claims against and rights with respect to SunEdison, including but not limited to the right to seek relief from the automatic stay provision and add SunEdison as a party.  Plaintiffs' election to not name SunEdison in this Second Amended Consolidated Complaint shall not constitute a waiver of Plaintiffs' rights or claims.

## THE PLAN

### Purpose

39.     The Plan is "a defined contribution retirement savings plan," covering all eligible employees of SunEdison and its subsidiaries.  *See* 2014 Form 11-K at 4.

40.     Upon information and belief, the purpose of the Plan is to provide Plan Participants with the opportunity to save for retirement.

### Administration of the Plan

41.     As noted above, the Investment Committee has served as the Plan Administrator during the Relevant Period.  *See* 2014 Form 11-K at 4.

42.     Upon information and belief, the Investment Committee, as Plan Administrator, is responsible for the day-to-day administration and operation of the Plan.

**Contributions**

43.     As explained by the 2014 Form 11-K, during the Relevant Period, the Plan has provided for the following types of contributions:

- Employee salary deferrals;

- Employee matching contributions;

- Employer non-matching contributions; and

- Employer "rollover" contributions.

*See* 2014 Form 11-K at 4.

44.     In particular, Plan Participants may elect to contribute to the Plan from 1% to 50% of their salary on a pre-tax basis.[3]  *See* 2014 Form 11-K at 4.  With respect to the Company's matching contributions, a Plan Participant "is eligible to receive employer-matching contributions of 100% of the first 3% of the employee's contribution, 50% of the next 2% contributed, and 20% of the next 1% contributed, up to 4.2% of the participant's covered compensation for the Plan year."  *Id*.  The Company "additionally contributes 2% of compensation as a non-matching contribution on behalf of all participants."  *Id*.  Finally, Plan Participants can contribute amounts representing distributions from other qualified defined benefit or contribution plans (rollover).  *Id*.

**Vesting**

45.     According to the 2014 Form 11-K, all Plan Participant accounts are immediately and fully vested.  *Id*. at 4.

---

[3]     The pre-tax contribution is limited to the amount specified by Section 402(g) of the Internal Revenue Code ($17,500 in 2014 and 2013).  *See* 2014 Form 11-K at 4.  Plan Participants who attained the age of 50 before the end of the Plan year are eligible to make catch-up contributions. *Id*.

## SUNEDISON STOCK FUND

46.     During the Relevant Period, the Plan offered a number of investment options, including a fund to invest in Company Stock (the "SunEdison Stock Fund").  *See* 2014 Form 11-K at 4, 8.  The SunEdison Stock Fund is "typically comprised of approximately 97% SunEdison common stock and 3% cash."  *Id*. at 5.  "Unitized accounting allows for same-day processing of transactions within the SunEdison Stock Fund."  *Id*.  Inter-fund transfers in and out of the SunEdison Stock Fund are limited to one per week.  *Id*. at 4.

47.     At December 31, 2014 and 2013, the Plan held 1,203,446 and 1,395,713 units of the SunEdison Stock Fund, respectively, of SunEdison Stock, with a fair market value of $16,822,243 and $18,214,054, respectively.  As of December 31, 2015, the Plan held 1,285,874 units of SunEdison Stock, with a fair market value of $4,979,417.[4]

## CLASS ACTION ALLEGATIONS IN THE ALTERNATIVE

48.     Plaintiffs bring this action derivatively pursuant to § 502(a)(2) and (3) of ERISA, 29 U.S.C. § 1132(a)(2) and (3).  Plaintiffs bring this action derivatively on the Plan's behalf pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, and, in the alternative, as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plan, Plaintiffs, and the following class of similarly situated persons (the "Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the SunEdison Retirement Savings Plan at any time between July 20, 2015[5] and April 21, 2016 (the "Relevant Period") and whose Plan accounts included investments in SunEdison Stock.

---

[4]     The Company's Form 11-Ks report the Stock Fund units as shares.  The Stock Fund consists of shares of the Company and cash and the therefore the number of Plan's share equivalent is less than the Stock Fund.

[5]     Plaintiffs reserve their right to modify the Relevant Period definition in the event that further investigation/discovery reveals a more appropriate and/or broader time period during which SunEdison Stock constituted an imprudent investment option for the Plan.

49.     Given ERISA's distinctive representative capacity and remedial provisions, courts have observed that ERISA litigation of this nature presents a paradigmatic example of a FED. R. CIV. P. 23(b)(1) class action.

50.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of employees of SunEdison who participated in, or were beneficiaries of, the Plan during the Relevant Period whose Plan accounts included SunEdison Stock.  For example, at the end of Plan year 2014, there were 2,153 Participants in the Plan.  *See* 2014 Plan Form 5500 filed with the Department of Treasury Internal Revenue Service and the Department of Labor.

51.     At least one common question of law or fact exists as to Plaintiffs and all members of the Class.  Indeed, multiple questions of law and fact common to the Class exist, including, but not limited to:

•       whether Defendants each owed a fiduciary duty to the Plan, Plaintiffs, and members of the Class;

•       whether Defendants breached their fiduciary duties to the Plan, Plaintiffs, and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's Participants and beneficiaries;

•       whether Defendants violated ERISA; and

•       whether the Plan, Plaintiffs, and members of the Class have sustained damages and, if so, what is the proper measure of damages.

52. Plaintiffs' claims are typical of the claims of the members of the Class because the Plan, Plaintiffs, and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of ERISA as complained of herein.

53. Plaintiffs will fairly and adequately protect the interests of the Plan and members of the Class because they have no interests antagonistic to or in conflict with those of the Plan or the Class.  In addition, Plaintiffs have retained counsel competent and experienced in class action litigation, complex litigation, and ERISA litigation.

54. Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the action, or substantially impair or impede their ability to protect their interests.

55. Class action status is also warranted under the other subsections of Rule 23(b)(1)(A) and (b)(2) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

### FACTS BEARING UPON DEFENDANTS' FIDUCIARY BREACHES

56. During the Relevant Period, Defendants knew or should have known that Company Stock had become an imprudent Plan investment option because the Company's basic risk profile had been so dramatically altered due to reckless acquisition strategy detailed below that it was no longer a prudent retirement investment for the Plan.  As explained herein, the Relevant Period begins no later than July 20, 2015.  During the Relevant Period, Defendants failed to cure their

fiduciary breaches because, upon information and belief, SunEdison Stock Fund remained an investment option under the Plan and the fiduciaries did not freeze the SunEdison Stock Fund, or taken any other action, consistent with ERISA and the federal securities laws, to prevent the Plan and its Participants from investing any more money in the failing SunEdison Stock.

57.     Plaintiffs' action concerns the rise and fall of SunEdison, which at its peak billed itself as "the world's largest renewable energy development company."  Defendants caused the Company to fall victim, however, to rapid, aggressive, and ill-advised expansion plans spearheaded by Chatila, the Company's former CEO, which required taking on inordinate amounts of corporate debt.  During the Relevant Period, Chatila and CFO Wuebbels, among others, both publicly and privately downplayed the severity of the liquidity constraints and debt burdens. Indeed, as set forth herein, Defendants misrepresented and omitted facts relevant to the Company's cash on hand and debt exposure.  Insiders at SunEdison and the YieldCo subsidiaries repeatedly raised issues and pointed out red flags.  According to a complaint filed by Global against Sun Edison, Chatila, Wuebbels, and SunEdison's Senior Vice President, General Counsel and Secretary Martin H. Truong,[6] certain Global insiders, including former Global CFO Alex Hernandez, former Global CEO Carlos Domenech Zornoza ("Domenech"), and former Global COO Francisco Perez Gundin ("Perez")[7] had collectively "raised concerns with SunEdison's Board about the extent of SunEdison's liquidity and the accuracy of SunEdison's public statements regarding its financial condition."  Even in the face of this and other protestations, however,

---

[6]     *Terraform Global, Inc. v. SunEdison Inc, et al.*, C.A. No. 12159-VCL (Del. Ch. filed Apr. 3, 2016) (the "Global/SunEdison Action").

[7]     Domenech and Perez are plaintiffs in two whistleblower actions against TERP and others pending in the United States District Court for the District of Maryland: *Zornoza v. TerraForm Global, Inc.*, No. 17-cv-0515-GJH (D. Md.), and *Gundin v. TerraForm Global, Inc.*, No. 17-cv-0516-GJH (D. Md.) (together, the "Whistleblower Actions").

Defendants continued their reckless course forward despite Defendants' knowledge of severe liquidity problems.

58.     SunEdison admitted that its internal controls over financial reporting suffered from material undisclosed weaknesses.  On March 16, 2016, in a Form 8-K filed with the SEC, SunEdison announced that it would be delaying the filing of its 2015 Form 10-K because it had identified material weaknesses in its internal controls over financial reporting.  Specifically, SunEdison stated that "[t]he scope of work required to finalize the Company's financial statements included in the 2015 Annual Report on Form 10-K has expanded due to the identification by management of material weaknesses in its internal controls over financial reporting, primarily resulting from deficient information technology controls in connection with newly implemented systems."  As a result, the Company would not be able to file its annual Form 10-K with the SEC in a timely manner.  That same day, TERP also announced that it would be delaying the filing of its 2015 Form 10-K because it relied on SunEdison's flawed internal controls over financial reporting which were "primarily due to ineffective controls in relation to our Enterprise Resource Planning (ERP) systems and processes for validating revenue recognition."  Then on March 29, 2016, Global admitted that it suffered from material weaknesses in its internal controls, stating that: "We currently have identified a material weakness in internal controls over financial reporting primarily due to SunEdison, Inc.'s ineffective controls over accounting consolidation and reporting system that we rely upon." Accordingly, the Company has admitted that its ERP system, SunEdison's accounting platform, suffered from material weaknesses during the Relevant Period.

59.     Indeed, SunEdison lacked internal controls necessary to produce reliable financial information about the Company.  As SunEdison admitted in its Form 8-K, filed with the SEC on April 14, 2016, an internal investigation conducted by the Board revealed that SunEdison lacked

"sufficient controls and processes regarding the Company's managing of cash flows, including extensions of accounts payable and the use of cash committed for projects, and related disclosures to the Board were not comprehensive or made on a timely basis":

> The Independent Directors have determined that as of the date of the independent counsel report, there were no identified material misstatements in the Company's historical financial statements as well as no substantial evidence to support a finding of fraud or willful misconduct of management, other than with respect to the conduct of one former non-executive employee as described below.  However, the independent counsel materials identified issues with the Company's overly optimistic culture and its tone at the top. The Independent Directors also identified several specific issues regarding the Company's cash forecasting and liquidity management practices, including that:
>
> - the Company's cash forecasting efforts lack sufficient controls and processes;
> - certain assumptions underlying the cash forecasts provided to the Board by the Company's management were overly optimistic and a more fulsome discussion of risks and adjustments with the Board was warranted;
> - the Company's management has not responded appropriately when forecasted targets were not met; and
> - the Company lacked sufficient controls and processes regarding the Company's managing of cash flows, including extensions of accounts payable and the use of cash committed for projects, and related disclosures to the Board were not comprehensive or made on a timely basis.

As a result of SunEdison's admitted "cash forecasting and liquidity management" failures, there was no reliable basis for the Company to determine whether it had sufficient available cash to meet its present and future needs.

60.    On May 12, 2016, SunEdison again admitted to "material weakness in its internal controls" during the Relevant Period:

> [The filing of SunEdison's Form 10-K for 2015] continues to be delayed due to the previously disclosed identification by management of material weaknesses in its internal controls over financial reporting, primarily resulting from deficient information technology controls in connection with newly implemented systems. Because of these material weaknesses, additional procedures are necessary for management to complete the Company's annual financial statements and related disclosures, and for the finalization of the audit of the Company's annual financial statements and the effectiveness of internal controls over financial reporting as of December 31, 2015.

61.     On May 17, 2016, Global admitted that because of its reliance on SunEdison's ineffective internal controls over financial reporting, Global too suffered from:

- "ineffective controls in the area of security and access to an accounting consolidation and reporting system implemented by SunEdison … specifically the design and maintenance of user access controls to ensure that access to the financial applications and data is adequately restricted to appropriate personnel";

- "inadequate controls over general and administrative expenses as well as acquisition, formation and related costs, specifically completeness, accuracy and timely recording of expenses and equity contributions in the appropriate reporting period"; and

- "inadequate controls over regional reporting, specifically timely identification and resolution of complex transactions and appropriate application of policy or U.S. generally accepted accounting principles."

62.     The Company lacked sufficient controls and processes regarding its managing of cash flows, including extensions of accounts payable and the use of cash committed for projects, and related disclosures to the SunEdison Board were not comprehensive or made on a timely basis.

63.     While Defendants continued to misrepresent the Company's financial well-being—at one point representing that the Company had $1.4 billion in cash and cash equivalents when, in fact, it had only *90 million* in available cash, according to an internal document reported on by the *Wall Street Journal* on April 14, 2016—it repeatedly failed to pay critical vendors. These vendors repeatedly threatened to cease operations, which would result in, among other things, fines to SunEdison and failure of projects to be "dropped down" to the YieldCos. In fact, as alleged in the March 17, 2017 Second Amended Securities Class Action Complaint in *Horowitz v. SunEdison, Inc.*, No. 16 Civ. 7917 PKC (S.D.N.Y.), since as early as 2014, and throughout the Relevant Period, SunEdison systematically delayed or refused to pay its critical vendors due to its liquidity shortfalls. Numerous former employees reported that SunEdison's failure to timely pay

its vendors directly impeded its ability to operate effectively.   The knowledge of SunEdison's broken system to pay vendors reached the highest level of SunEdison's management, including Chatila.  Notwithstanding their knowledge of SunEdison's existential liquidity crunch, Defendants continued to misrepresent the financial health of the Company and invest Plan assets in the SunEdison Stock Fund.

**A.**      **The Strategy Leading To The Liquidity Crisis**

64.      SunEdison finances, builds, owns, and operates various solar and wind power plants, having developed over 1,300 solar and wind projects in 20 countries.   A key part of SunEdison's business is use of YieldCos, which are used in the energy industry, particularly in the renewable energy sector, as a way to finance various types of clean energy production.  YieldCos are dividend growth-oriented public companies created by a parent company, such as SunEdison, that bundles long-term contracted operating assets to produce predictable cash flows. YieldCos are taken public, and the proceeds are up-streamed to the parent to allow for further project development.  The parent company, such as SunEdison, acquires assets such as power-generating plants, and then sells those assets and their customer contracts for power purchasing to the YieldCos.   The contracts then generate ongoing cash flows, meant to be distributed to the YieldCos' shareholders as dividends.

65.      Prior to the start of the Relevant Period, SunEdison spun off two separate corporate entities set up as YieldCos, to raise capital to fund the massive solar and wind power projects that are at the heart of the Company's business.

66.      On May 29, 2014, SunEdison announced that TERP had filed a registration statement with the SEC for a proposed initial public offering ("IPO").  SunEdison retained over 90% of the voting power in the company.  According to SunEdison's filings, "our business model is to contribute or sell solar energy systems to our TerraForm Power [TERP] segment, and to

realize cash upon the completion and sale of a solar energy system." SunEdison's Annual Report on Form 10-K for the 2014 fiscal year.

67.     Throughout the next year, SunEdison issued quarterly financial statements touting the prospects of its growth in the alternative energy market. At the same time, the Company also continued its acquisition strategy, announcing its acquisition of First Wind Holdings, LLC ("First Wind") for $2.4 billion in a transaction that was announced on November 18, 2014 and completed on January 29, 2015.

68.     To fund this and other acquisitions, discussed below, SunEdison raised $190 million through a secondary offering of shares in Singapore-based SunEdison Semiconductor Ltd., offered $400 million of convertible senior notes due 2022, $375 million aggregate principal amount of convertible senior notes due 2023, and $375 million aggregate principal amount of convertible senior notes due 2025.

69.     Importantly, in order to further fund the First Wind acquisition, on January 29, 2015, a wholly-owned subsidiary of SunEdison entered into a $410 million margin loan agreement (the "Margin Loan"). At the time of the Margin Loan agreement, SunEdison concurrently entered into a guaranty agreement in favor of the administrative agent for the benefit of each of the lenders, *pursuant to which SunEdison guaranteed all of the subsidiary's obligations under the Margin Loan* agreement.

70.     The Margin Loan was secured by a first priority lien on 32.2 million shares of a super-voting class of TERP stock controlled by SunEdison and certain other rights, and was conditioned upon the performance of TERP stock. SunEdison was required to take certain remedial measures in the event that TERP's stock price underperformed. Specifically, if the value of the loan eclipsed a certain percentage of the value of the pledged TERP stock, based on the price of

TERP's publicly traded stock, then SunEdison would either have to pay the loan in full or provide cash to satisfy the loan-to-value shortfall.

71.     As explained further below, SunEdison's need to post cash collateral to satisfy calls on the Margin Loan, coupled with the liquidity crunch it brought upon itself, were a significant factor in the demise of the Company.

72.     At the time of the First Wind acquisition, SunEdison's liquidity problems were already known to Defendants. Indeed, on April 22, 2016, the Company admitted to the Bankruptcy Court that it had begun to face a "liquidity challenge" by, at latest, the spring of 2015.

73.     On May 7, 2015, SunEdison announced that Global, its second YieldCo, had filed a registration statement in preparation for its IPO.

74.     Also at this time, SunEdison began an incredibly aggressive series of acquisitions notwithstanding its liquidity crunch, agreeing to purchase certain entities as follows (and as detailed further below):

- On May 19, 2015, the Company entered into a share repurchase agreement to acquire outstanding shares of Latin America Power Holding, B.V.;

- On June 16, 2015, SunEdison announced that it would acquire Globeleq Mesoamerica Energy.  In the press release, Chatila touted the expansion of SunEdison, thereby encouraging investors, including the Plan Participants, to retain and buy SunEdison Stock on the perception that the Company was building a plan of sustainable growth;

- On June 16, 2015, the Company announced it had entered into an agreement to acquire Continuum Wind Energy Limited;

26

- On June 25, 2015, TERP and SunEdison jointly announced the acquisition from Duke Energy Renewables of a 9 megawatt net ownership stake in certain solar power plants;

- On July 1, 2015, SunEdison announced the $360 million financing and start of construction, to cost $420 million, on the Bingham Wind project in Maine;

- On July 2, 2015, the Company announced that it had entered into a memorandum of understanding with Gamesa, a Spanish wind turbine company, pursuant to which SunEdison would acquire certain power plants by 2018 to be "dropped down" to TERP;

- On July 6, 2015, SunEdison announced a $2 billion agreement to acquire wind power plants from Invenergy Wind LLC;

- On July 15, 2015, Global entered into an agreement with Renova Energia, S.A., pursuant to which it would acquire the rights to wind and hydropower projects in Brazil for cash and Global stock after Global's IPO; and

- On July 15, 2015, SunEdison acquired Mark Group, a U.K. based solar panel installer, for $36 million in total consideration.

75.     As a result of the acquisitions in the first six months of 2015, SunEdison's overall corporate debt shot up from $7.2 billion at the end of 2014 to $10.7 billion by the end of the second quarter of 2015.

76.     On July 19, 2015, Global announced that it would offer, in a private transaction, up to $800 million aggregate principal amount of senior notes due 2022 "to fund in whole or in part, renewable energy projects ('Eligible Green Projects'), which includes the financing or refinancing

of, or investments in, equipment and systems which generate or facilitate the generation of energy from renewable sources, such as solar, wind and hydroelectric energy."

77.     Following the July 19, 2015 announcement, SunEdison and Global's underwriters immediately commenced a road show seeking to encourage investors to participate in the Global IPO and a related bond offering.  A team of company representatives, including Alex Hernandez, TERP CFO; Avenier, Global CFO; Manu Sial, SunEdison Senior Vice President of Finance; and Robert Morris, SunEdison Vice President of Investor Relations, solicited investors in a teleconference call on July 23, 2015 and during presentations in London on July 22, 2015, New York on July 23 and 24, 2015, Boston on July 27, 2015, Los Angeles on July 28, 2015 and July 29, 2015 and San Francisco on July 29, 2015.  Another team of representatives, including Kevin Lapidus, SunEdison Senior Vice President, and Adam Kuehne, Global Director of Capital Markets, solicited investors during presentations in Hong Kong on July 21, 2015 and Singapore three days later.

78.     During the July 20–29, 2015 road show ahead of the offering, Defendants continued to represent to investors that it had sufficient liquidity to run its business.

79.     On July 29, 2015, Global sent letters to the SEC requesting acceleration of the effective date of the registration statement to July 30, 2015, at 4:00 p.m., or as soon thereafter as possible.  At the time the request for acceleration was submitted, Defendants were aware or should have known that SunEdison's 2Q15 results would be significantly below market expectations, as described below.  They were aware or should have known of the breach or impending breach of the Margin Loan debt covenants.

80.     Rather than address known needs to increase revenues, lower debt, and service existing debt, the Company again jumped into another acquisition.  On July 20, 2015, SunEdison

announced in a press release that it had entered into a merger agreement with Vivint Solar, Inc. ("Vivint" or "VSLR"), a provider of residential solar systems in the United States, for *$2.2 billion* in cash, stock and convertible notes (the "Vivint Solar Acquisition"). Defendant Chatila stated in pertinent part as follows with regard to the Vivint Solar Acquisition:

> SunEdison's acquisition of Vivint Solar is a logical next step in the transformation of our platform after the successful execution of our First Wind acquisition in January 2015. We expect the Vivint Solar transaction to create significant value for our stockholders through the accretion in our TerraForm Power ownership, the acceleration of our Incentive Distribution Rights and an immediate expansion of our capacity and bandwidth to grow our residential business in the U.S. and globally. As of the fourth quarter of 2015, our organic growth and recent acquisitions will put SunEdison on track to deploy more than 1 gigawatt per quarter.
>
> *     *     *
>
> With Vivint Solar, we're tripling our value.

*See* July 20, 2015 SunEdison Press Release.

81.    However, SunEdison's acquisition plan was not sustainable. By the time of the Vivint Solar Acquisition, the Company was already highly leveraged and in financial distress as evidenced by its quarterly reports discussed below. As such, SunEdison needed TERP'S liquidity and credit resources to help finance the Vivint Solar Acquisition. Consequently, SunEdison used its control over TERP (SunEdison retained over 90% of the voting power in TERP Power after its IPO) to compel TERP to purchase the assets that SunEdison was acquiring as part of its acquisition of Vivint. As alleged in a derivative action against SunEdison filed on behalf of TERP, *Appaloosa Investment Limited Partnership I v. SunEdison, Inc., et al.*, Case No. 11898 (Del. Ch. Jan. 12, 2016), unlike the traditional utility-scale projects that TERP acquired from SunEdison in the past, which involved credit-worthy counterparties and generated reliable cash flows, the residential rooftop solar assets that SunEdison was selling to TERP as part the Vivint Solar Acquisition, had

individual homeowners as counterparties, reflecting significantly higher credit risk and lower reliability of cash generation.

82.     The Vivint deal was criticized in the financial community as overpriced and too divergent from SunEdison's traditional utility-scale projects.  MacQuarie Group stated in a July 21, 2015 analyst report that "There is no denying that a ~60% premium paid for VSLR's [Vivint Solar] vs. its Friday close is gob smacking."

83.     The day prior to the announcement of the Vivint deal, SunEdison's stock closed at $31.56 per share.  By the end of the following week, the shares traded at $26.01 per share, with weekly volume of 93.2 million shares as compared to the prior week's volume of 36.4 million shares.  The one-week decline in the price of the shares was equivalent to 17.6% or $5.55 per share.  Unbeknownst to Plan Participants and the investing public, this dramatic decline put the Company at risk for triggering a substantial margin call on the Margin Loan.

84.     Around the same time, in late July 2015, SunEdison completed Global's IPO, selling 45 million shares at $15 per share.  Global had initially stated that it planned to offer 56.6 million shares for $19 to $21 each.  Due to the insufficient investor demand, however, SunEdison agreed to acquire $30 million of Global's Class A common stock that had been expected to be purchased by public shareholders.  Defendants, of course, were well aware of the market's negative response to the Vivint Solar Acquisition and to Global's IPO.

85.     The falling price of SunEdison Stock in the wake of the announcement of the Vivint Solar Acquisition, as well as the media reports criticizing this deal, were red flags that should have prompted Defendants to investigate the continued prudence of retaining and purchasing further SunEdison Stock for the Plan.  Yet, Defendants continued to maintain the SunEdison Stock Fund as a Plan investment to the detriment of Plan Participants.  Following the announcement of the

Vivint Solar Acquisition, SunEdison Stock remained on a downward trajectory, thereby eroding the value of the Plan Participants' retirement savings.

86. Rather than pulling back after the Vivint Solar Acquisition, the Company continued to strain its liquidity even further. On July 31, 2015, Global launched its IPO. Originally, Global intended to raise a total of $1 billion. However, SunEdison was ultimately only able to raise $675 million through this IPO.

87. Following the disappointing IPO of Global, SunEdison Stock's price continued to decrease. Defendants had knowledge of the problems with the Company's YieldCos because both YieldCos were dominated and controlled by SunEdison, its officers and its Board. The SunEdison Directors used SunEdison's ownership of more than 90% of the voting power of the YieldCos (through the ownership of Class B common stock) to install SunEdison executives and other insiders as officers and a majority of the directors of Global and TERP. Under management services agreements with the YieldCos, SunEdison is responsible for carrying out all day-to-day management, secretarial, accounting, banking, treasury, administrative, liaison, representative, compliance, regulatory and reporting functions and obligations. Pursuant to its Management Services Agreement with Global, SunEdison, among other things, hires and supervises Global's employees; oversees the preparation of Global's books and records and financial statements; oversees Global's accountants, legal counsel and other accounting, financial or legal advisors; and arranges for individuals to carry out the functions of the principal executive, accounting and financial officers of Global for purposes of applicable securities laws and the regulations of any stock exchange on which Global securities are listed. SunEdison also finances, supports and controls Global's operations through other contractual arrangements with Global, including a

31

Support Agreement, Project Investment Agreement, Repowering Services Agreement and Interest Payment Agreement.

88.     The YieldCos were designed to return most of the cash flow from the projects to investors in the form of dividends.  SunEdison was the sponsor of and retained a significant amount of the equity in the YieldCos.  Defendants touted both YieldCos as "high growth" entities that would generate consistent and growing dividends from the projects SunEdison would develop and drop down.

89.     Defendants asserted that the YieldCos would generate stable dividends due to the lower risk associated with renewable energy plants, which had contracted off-takes with relatively low maintenance costs and were not subject to rising fuel prices like traditional power plans.  When Global was formed in mid-2015, Defendants told investors that Global planned to return 85% of its annual cash available for distribution ("CAFD") to investors as dividends and projected it would be able to achieve a compound annual growth rate ("CAGR") in dividends per share ("DPS") of 20% over the three years following its IPO.  SunEdison and Global regularly disclosed CAFD "because," as stated in the registration statement used in connection with Global's IPO, "management recognizes that it will be used as a supplemental measure by investors and analysts to evaluate our liquidity."

90.     By virtue of its ongoing equity stake in the YieldCos, Defendants told investors it would continue to share in the cash flow generated by developed projects after they were dropped down to Global or TERP.  SunEdison's ownership interests in its YieldCos gave it the right to receive dividends and additional payments, called incentive distribution rights ("IDRs"), as performance targets were met.  YieldCos thus became the primary vehicle by which SunEdison could monetize the projects in its development pipeline.  Defendants repeatedly asserted that this

retained indirect ownership of SunEdison's renewable energy projects allowed SunEdison to realize greater value than it could by simply developing and selling the projects outright to third parties.

91.     To grow dividends, SunEdison needed to be able to continue to develop and drop projects down to the YieldCos. To assure investors that it could do so, SunEdison provided each YieldCos with a "call rights list" that provided the YieldCos with a right of first offer ("ROFO") on specified projects in SunEdison's development pipeline. These lists could include projects SunEdison had developed on its own as well as projects it had acquired from other entities. The projects on the call rights list, together with forecasts of other projects in SunEdison's development pipeline, were used to provide investors with forecasts of CAFD, DPS and megawatt ("MW") growth.

92.     To succeed, SunEdison's plan required that projects be dropped down at prices that would allow the YieldCos to realize an internal rate of return ("IRR") in excess of the cost of capital and thereby result in spreads that would generate substantial CAFD per share and fuel dividend payments to investors. Defendants repeatedly told investors that SunEdison would sacrifice sales margins on dropped down projects where needed to provide an IRR that would permit the YieldCos to meet its CAFD and DPS growth targets. Defendants also told investors that such sales would increase the dividends and IDRs it received from its equity stake in the YieldCos by an amount that would exceed the value of foregone margins on such sales. SunEdison also told investors that the increased dividends and IDRs it would receive from those projects as a result of its ownership stake in the YieldCos would exceed the value of any profits it sacrificed by selling the projects to YieldCos at prices that were lower than what it could have realized on the open market.

93.     The ability of the YieldCos to access equity and debt markets at attractive terms to fund project acquisitions from their parent was thus critical for SunEdison given its highly leveraged balance sheet.  The inability of the YieldCos to do so, or the inability of SunEdison to drop projects down at high enough IRRs, would necessarily result in insufficient CAFD to fund expected dividend growth, stalling SunEdison's growth, tying up its liquidity, and giving rise to risk of default on its borrowing arrangements.

94.     Thus, SunEdison's balance sheet, capital structure, liquidity and financial strength were critical to investors.

95.     Defendants represented to investors that its liquidity and financial strength gave its Renewable Energy Development Segment, or "DevCO," the ability to finance the development or acquisition of projects that could be dropped down to Global and TERP at prices that provided an IRR that would generate CAFD sufficient to meet DPS growth forecasts.  To further assure investors of its liquidity, in 2015 the Company announced plans to launch more than $2.5 billion of warehouse financing facilities that could hold projects between the time they were completed and the time they were dropped down to one of the YieldCos.  Defendants told investors that the warehouses protected the YieldCos from being forced to go to the capital markets when lending conditions were unfavorable and protected SunEdison from having it liquidity tied up in completed projects awaiting acquisition.

96.     In fact, by the summer of 2015, Defendants knew that SunEdison's liquidity was significantly worse than publicly represented.  Contrary to Defendants' representations, SunEdison lacked sufficient liquidity to acquire and construct the projects needed to meet its growth estimates, or to drop those projects down to its YieldCos to meet their forecast CAFD and DPS estimates.  Moreover, the price of the YieldCos' stock had declined, and their ability to access the financial

markets at reasonable rates of return had declined, significantly worsening SunEdison's liquidity position and eliminating its ability to meet the MW, CAFD, and DPS growth estimates Defendants had led the market to expect.

97.     At all relevant times, Chatila and Wuebbels, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), certified in documents filed publicly with the SEC that they had evaluated the "the effectiveness of the design and operation of [SunEdison's] disclosure controls and procedures" and deemed them compliant.

98.     Throughout the Relevant Period, Chatila and Wuebbels certified that they had reviewed the Company's internal financial disclosure controls and procedures.  Had Chatila and Wuebbels conducted an honest and earnest review, they would have found—as later came to light—that the Company's internal controls were severely lacking.  In such circumstances, a prudent ERISA fiduciary (such as Wuebbels was required to be) would not have invested Plan assets in the SunEdison Stock Fund.

99.     In its Form 10-Q for first quarter of 2015, the Company represented that Chatila and Wuebbels had personally reviewed SunEdison's internal financial disclosure controls and procedures and deemed them legally compliant.  The similarly specifically provided that:

> We carried out an evaluation as of March 31, 2015 under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of March 31, 2015.

> *Changes in Internal Control over Financial Reporting*

> There have been no changes in SunEdison's internal control over financial reporting during the quarter ended March 31, 2015 that have materially affected, or are reasonably likely to materially affect, SunEdison's internal control over financial reporting.

*See* 1Q15 Form 10-Q at 58.

100.    The Form 10-Q for 2Q15 specifically provided that:

We carried out an evaluation as of June 30, 2015 under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of June 30, 2015.

*Changes in Internal Control over Financial Reporting*

There have been no changes in SunEdison's internal control over financial reporting during the quarter ended June 30, 2015 that have materially affected, or are reasonably likely to materially affect, SunEdison's internal control over financial reporting.

*See* 2Q15 Form 10-Q at 67.

101.    In its Form 10-Q for the third quarter of 2015, Chatila and Wuebbels once again certified that its internal financial disclosure controls and procedures were "effective," though this quarter they added that the Company was undertaking measures to "enhance" these already "effective" controls:

We carried out an evaluation as of September 30, 2015 under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of September 30, 2015.

*Changes in Internal Control over Financial Reporting*

During the third quarter of 2015, we completed the implementation of a new global consolidation system that will enhance our consolidation processes, and we are in the process of implementing a new global enterprise resource planning system ("ERP") that will enhance our business and financial processes and standardize our information systems.  In October 2015, we substantially completed the ERP

implementation with respect to several operations and will continue to roll out the ERP in phases over the next several years.  As with any new information systems we implement, these applications, along with the internal controls over financial reporting and consolidation included in these processes, will require testing for effectiveness. In connection with these implementations, we are updating our internal controls over financial reporting and consolidation, as necessary, to accommodate modifications to our business processes and accounting procedures. We do not believe that these implementations will have an adverse effect on our internal control over financial reporting or consolidation.  Except as described above, there were no changes in SunEdison's internal control over financial reporting during the quarter ended September 30, 2015 that have materially affected, or are reasonably likely to materially affect, SunEdison's internal control over financial reporting.

102.    Chatila and Wuebbels personally certified that each of these Forms 10-Q were true and correct.  The CEO and CFO certifications repeatedly represented, in language identical or nearly identical, to that set forth below:

I, [Chatila or Wuebbels], certify that:

1.    I have reviewed this quarterly report on Form 10-Q of SunEdison, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision; to ensure that material information relating to the registrant, including its consolidated subsidiaries is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

103.    Pursuant to the SOX, Chatila and Wuebbels repeatedly attested in separate certifications accompanying the Forms 10-Q that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

## B.     Defendants Chatila And Wuebbels Were Incentivized To Pursue Growth At Any Cost

104.    SunEdison's executives, including executives responsible for administering the Plan, recklessly pursued growth, in substantial part because SunEdison's executive compensation

38

plan incentivized Chatila and Wuebbels to dramatically build up SunEdison's pipeline, even at the cost of SunEdison's long-term profitability.

105.    In March 2014, SunEdison altered its executive compensation program to focus on SunEdison's "Foregone Margin," rather than the typical measures of corporate profitability such as operating income and cash flow, on which the 2013 plan had been based.  As detailed in SunEdison's 2015 Annual Proxy Statement, filed with the SEC on April 17, 2015, the 2014 executive compensation plan measured Foregone Margin as "the sum of SunEdison EBITDA and foregone margin (a measure which tracks margin foregone due to the strategic decision to hold projects on the balance sheet vs. selling them)."  Moreover, SunEdison provided a more detailed description of Foregone Margins in its 2014 Form 10-K, stating that the Foregone Margin "means the net income (or loss) in connection with the Disposition or planned Disposition of any Solar Energy System (or any Person owning such Solar Energy System) by the Borrower[.]"  SunEdison calculated the Foregone Margin by multiplying (i) the difference between the total revenue "earned or projected to be earned" from a project and the "total projected costs" to construct the project by (ii) the estimated percentage completion of the project, and then subtracting any previous Foregone Margin previously included in the calculation.  In March 2014, for purposes of the Company's executive compensation plan, SunEdison's Board:

> [M]odif[ied] the specific measures of corporate performance to 70% profitability, as measured by the sum of EBITDA and foregone margin (a measure which tracks margin foregone done to the strategic decision to hold projects on the balance sheet vs. selling them) and 30% megawatts completed to better reflect key 2014 areas of focus.

106.    The Second Lien Credit Agreement, filed as Exhibit 10.1 to SunEdison's Form 8-K filed on January 11, 2016, also provided additional details about Foregone Margin and how it was to be calculated.  Foregone Margin was defined as "the net income (or loss) in connection

with the Disposition or planned Disposition of any Solar Energy System (or any Person owning such Solar Energy System) by the Borrower."  It was calculated by "multiplying (i) the difference between (x) total revenue … earned or projected to be earned" from the project "and (y) total projected costs" to construct the project "by (ii) the estimated percentage of completion" of the project, "and then subtracting any previous foregone margin previously included in the calculation.

107.    The result was that SunEdison's executives could now benefit from "projected" earnings, rather than actual earnings.

108.    Defendants responded to these incentives.  Over the course of 2014 and 2015, particularly after SunEdison instituted this new compensation model, SunEdison reported substantial Foregone Margins:

|  | 2014 Q1 | 2014 Q2 | 2014 Q3 | 2014 Q4 | 2015 Q1 | 2015 Q2 | 2015 Q3 |
|---|---|---|---|---|---|---|---|
| Foregone margin: | $25m | $145m | $180m | $130m | $31m | $94m | $138m |

109.    Meanwhile, SunEdison's total operating income and free cash flow—on which the 2013 executive incentive plan had been based—fared poorly.  Total operating income declined from a loss of $313 million in 2013 to a loss of $536 million in 2014—a 70% decrease.

110.    Similarly, on a non-GAAP basis, SunEdison's free cash flow plummeted from a loss of $107.1 million in 2013 to a loss of $562.1 million in 2014—a decline of over 425%.

111.    Nonetheless, because of SunEdison's changes to its executive compensation plan, its executives, including some of the Defendants named herein responsible for administering the Plan, received significant bonuses.  In 2014, Chatila received Annual Incentive Awards that likely far exceeded the compensation he would have received under the 2013 executive incentive plan, which was based upon measurements of total cash flow and operating income.  Indeed, the Company's total operating income declined from a loss of $313 million in 2013 to a loss of $536

million in 2014 – a 70% decline.  Similarly, on a non-GAAP basis, the Company's free cash flow plummeted from a loss of $107.1 million in 2013 to a loss of $562.1 million in 2014 – a decline of over 425%.  Accordingly, the Executive Defendants would have received far less in personal compensation under the prior, more typical, measures of corporate profitability.[8]

112.    SunEdison also relied on the Foregone Margin measurement to expand its access to credit.  The Company's February 2014 credit agreement for its letter of credit facility (which was critical to providing SunEdison with operating capital) had, at the time it was entered into, a liquidity covenant requiring SunEdison to maintain a "Consolidated Leverage Ratio" of the Company's indebtedness to EBITDA (Earnings Before Interest, Taxes, Depreciation, & Amortization).  On January 20, 2015, SunEdison amended the credit agreement to materially change the liquidity covenant to include Foregone Margins, rather than just net income.

## C.    SunEdison Leverages Its TERP Interests to Obtain Additional Financing, Including the $410 Million Margin Loan

113.    On January 29, 2015, SunEdison had completed the $2.4 billion acquisition of First Wind LLC.  Funding for the acquisition included the $410 million two-year Margin Loan from Deutsche Bank AG, Goldman Sachs Lending Partners LLC, Barclays Bank plc, Morgan Stanley Bank, N.A. and MIHI LLC.  Additional acquisition financing was provided by the sale of approximately $337 million worth of SunEdison 3.75% Guaranteed Exchangeable Senior Secured Notes due 2020 (the "Exchangeable Notes").

114.    SunEdison was the exclusive owner of TERP's Class B Shares, which were convertible to shares of TERP's publicly traded Class A common stock.  Both the Margin Loan and the Exchangeable Notes were secured by SunEdison's interests in TERP Class B securities,

---

[8]    SunEdison always filed an annual proxy statements in April.  In April 2016, because it had filed for bankruptcy, SunEdison did not file an annual proxy reflecting its executive compensation awarded in 2015.

consisting of its 62.7 million shares of Class B stock, Class B units and IDR rights in TERP.  As described above, with respect to the Margin Loan, SunEdison initially pledged 32.2 million shares of its Class B stock and units and 50% of its IDRs as collateral.  Both agreements also required SunEdison to post additional collateral if the value of the Class B securities—as measured by the public trading price of TERP Class A stock—fell below specified levels.

115.    The Margin Loan provided for debt covenants that required (i) the value of TERP common stock to remain above a specified value (the "Market Value Trigger"); and (ii) the loan-to-value ratio of TERP common stock relative to the total borrowings under the loan be maintained above a specified level (the "Market Trigger Level").  If TERP's stock price fell below the Market Value Trigger, SunEdison was required to *prepay in full* all outstanding indebtedness on the loan *the next business day*.  If the loan-to-value ratio exceeded the Margin Trigger Level, SunEdison was required to either prepay the loan or provide additional cash collateral to bring the Market Trigger Level down to the permitted level by 5:00 p.m. on the second business day after the limit was exceeded.  In addition, by 5:00 p.m. of the first business day after the covenant violation, SunEdison was required to provide an irrevocable notice of its intent to either prepay the loan or post additional collateral, along with "a description, in reasonable detail of the source of such prepayment and/or such Margin Cash Collateral."

116.    The Market Value Trigger, Margin Trigger Level and related terms of the agreement (including the "Margin Initial Level," "Margin Reset Level" and "Margin Release Trigger") were defined in a side letter agreement that was ***not*** publicly disclosed.  SunEdison's 1Q15 Report on Form 10-Q filed with the SEC on May 7, 2015 stated that the loan required SunEdison to maintain a loan-to-value ratio not to exceed 50% (meaning it had to post at least $2

in collateral for each $1 borrowed under the agreement).  In the Form 10-Q filed with the SEC on November 9, 2015, the loan-to-value ratio was reported to be 40%.

117.    Neither the 1Q15 Report on Form 10-Q nor any other publicly filed document specified the collateral values or the method of their calculation with sufficient specificity to permit investors to determine at what stock price the Margin Trigger Level or Market Value Trigger or other debt covenants would be breached.

118.    Critically, the Margin Loan agreement was executed by Wuebbels on behalf of SUNE ML1, LLC, *i.e.*, the SunEdison subsidiary party to the Margin Loan agreement.

119.    The Margin Loan and Exchangeable Notes were also falsely classified in SunEdison's 1Q15 and 2Q15 Reports on Form 10-Q as debt that was "Non-recourse to SunEdison."  SunEdison's 3Q15 Report on Form 10-Q later filed on November 9, 2015, corrected the entries to identify both agreements to indicate that they were not non-recourse debt, thereby admitting that Defendants had understated the amount of SunEdison's recourse debt by $740 million on its prior financial statements.

120.    At this time, the Company represented in its public filings that it had significant cash and cash equivalents on hand to operate continuously for the following year.  For example, in the 2014 Annual Report, which was incorporated into the Form 10-K filed with the SEC on March 2, 2015**,** the Company misrepresented its liquidity position:

*Liquidity*

Cash and cash equivalents, plus cash committed for construction projects, at December 31, 2014 totaled $1,074.4 million, compared to $831.5 million at December 31, 2013. . . .  We believe our liquidity will be sufficient to support our operations for the next twelve months, although no assurances can be made if significant adverse events occur, or if we are unable to access project capital needed to execute our business plan. . . . We expect cash on hand, 2015 operating cash flows, project finance debt, the Solar Energy credit facility, the TerraForm term loan and project construction facility to provide sufficient capital to support the

acquisition and construction phases of our currently planned projects for 2015 and otherwise meet our capital needs for the remainder of 2015.

121.    Wuebbels reported on the SunEdison and TERP Q2 earnings conference call on Thursday, August 6, 2015, that while there would be construction financing "on a project-by-project basis . . . as far as corporate financing" was concerned, Wuebbels said that the Company did not "see any additional financings to be able to achieve" its sought-after growth. Notwithstanding this representation, and as discussed in further detail below, in July 2015, SunEdison had negotiated a lien loan of $169 million from Goldman Sachs, carrying an interest rate of 9.25% and an origination fee of $9 million, good for an effective interest rate of 15% (the "15% Goldman Loan") and, consequently, payments of $25 million to Goldman Sachs over the one-year loan term just for access to the capital.  The corresponding loan agreement was entered into on August 11, 2015, though the loan was not disclosed until November 9, 2015.

122.    In the SunEdison and TERP Q2 2015 earnings call on August 6, 2015 with Morris, Wuebbels, and Chatila, the Company misrepresented its access to certain credit warehouse facility funds in an amount up to $673 million.  Specifically, Wuebbels discussed an accompanying presentation showing approximately $2 billion in Q215 ending cash, stating that:

> On slide 15 I want to talk to you about cash.  We show the cash walk at the end of the first quarter to the end of the second quarter for the consolidated businesses, including TerraForm Power.  As you can see, we have a good match of sources and uses with the global private placements largely offsetting the acquisitions for TerraForm Global, as well as organic construction expenses being offset by warehouses, further illustrating the strong liquidity position in SunEdison.  Of the $2 billion in cash at the end of the quarter, roughly $400 million was in TerraForm Power and $620 million related to TerraForm Global, leaving SunEdison, the development company, with greater than $1 billion of cash and sufficient liquidity to support the future growth of the platform

123.    In actuality, however, the Company could not access this warehouse facility.  As reported in a March 28, 2016 *Wall Street Journal* article entitled "SEC Investigating SunEdison's

Disclosures To Investors About Its Liquidity," the purported cash on hand at DevCo was comprised "largely of cash that SunEdison couldn't access.  The Company had direct access to only a few hundred million dollars throughout September and October, and by November, the balance had dropped under $100 million" in large part because the "roughly $500 million credit facility, whose funds could only be accessed by delivering projects that met certain criteria, of which SunEdison had few."  As the Company admitted to the Bankruptcy Court on April 21, 2016:

> [I]n October 2015 the entire Margin Loan became mandatorily prepayable.  This Prepayment, which amounted to $439 million, drained SunEdison's cash reserves and fundamentally changed its and YieldCos' financial outlook.

*In The Matter of SunEdison, Inc., et al.*, 16-10992 (SMB) United States Bankruptcy Court for the Southern District of New York, Declaration of Patrick M. Cook, Dkt. No. 4 at 28 (April 21, 2016). In other words, by this time the Company was effectively insolvent.  As detailed herein, the Company managed to continue for several months thereafter because it looted a subsidiary.

124.     *The Wall Street Journal*'s March 28, 2016 account is confirmed by two former senior officers of SunEdison, Domenech and Perez, who brought the Whistleblower Actions against TERP and others, including Chatila, Wuebbels, Hernandez, and Blackmore.

125.     Notwithstanding the Company's inability to tap into this credit, Wuebbels repeated his claim about access to this facility in the Q315 earnings call held on November 10, 2015 when he represented that SunEdison had access to approximately $1.4 billion in liquidity.

**D.     SunEdison Incurs Billions of Dollars in Debt and Obligations to Acquire Projects to Drop Down to Global and TERP and Misrepresents that It Has Ample Liquidity to Do So**

126.     On June 16, 2015, SunEdison announced it had signed an agreement to acquire Continuum Wind Energy Limited, which owned 412 MW of wind power projects operating and under development in India and 1,000 MW of wind projects under development.  In a separate announcement the same day, SunEdison announced it would acquire Globeleq Mesoamerica

45

Energy, owner of 405 MW of wind and solar projects operating or under development in Central America and 246 MW of wind projects under development.  SunEdison stated that all of the projects from both acquisitions were to be placed on the Global call rights list.  Terms of and financing arrangements for the transactions were not announced.

127.    On June 29, 2015, SunEdison announced that it had acquired 521 MW of wind power plants located in Idaho and Oklahoma from Atlantic Power and had formed a $525 million warehouse financing facility to hold the assets pending dropping them down to TERP.  Morgan Stanley, Citi, and Goldman Sachs led the structuring of the finance facility and provided debt in the form of a 7-year term loan funded by MacQuarie, John Hancock, and SunEdison.  SunEdison CFO Wuebbels was quoted in the release as stating that the warehouse "provides repeatable and scalable funding," and SunEdison expected to add additional warehouse facilities to house future acquisition.

128.    On July 6, 2015, SunEdison announced a $2 billion agreement to acquire 930 MW of wind power plants from Invenergy Wind LLC.  The agreement called for TERP to acquire 460 MW through a combination of cash on hand and bond financing and assume $450 million in project debt.  The remaining 470 MW was to be acquired by a new SunEdison warehouse financing facility, to be held for later drop down in TERP.  TERP raised its 2016 dividend guidance from $1.53 to $1.70 based on the acquisition, representing 26% growth over its 2015 dividend.

129.    On July 15, 2015, Global entered into an agreement to acquire the rights to wind and hydropower projects in Brazil from Renova Energia for cash and Global common stock upon the completion of Global's IPO.  The transaction was initiated in May 2015 when Global signed a sale and purchase agreement for the three Renova projects.  In connection with Global's IPO, Global committed, subject to certain conditions, to acquire 12 additional Brazilian wind and hydro

projects from Renova over the following four years.  Global also acquired a 15% ownership interest in Renova from Light Energia, S.A. for $250 million, payable in shares of SunEdison common stock.  SunEdison publicly announced the deal on July 21, 2015.

130.    On July 20, 2015, SunEdison announced the $2.2 billion acquisition of U.S. residential solar installer Vivint.  In connection with the announcement, SunEdison forecast that it would complete 4.2-4.5 gigawatts ("GW") of projects in 2016, a roughly 50% increase from previous guidance of 2.8-3.0 GW.  The VSLR deal called for TERP to finance $922 million of the acquisition price for cash by issuing $737 million in common stock to the public and borrowing $225 million to acquire 523 MW of VSLR solar system assets.  The remainder of the financing was to be provided by SunEdison through a $500 million secured debt facility, the issuance of $370 million in common stock, $350 million in convertible notes and $57 million in cash.

131.    Negotiations to finalize the terms of the VSLR acquisition were underway before the June 9, 2015 sale of Global Class D Securities.  The VSLR acquisition was originally proposed by Domenech in a phone call with VSLR's CEO on March 6, 2015.  Due diligence for the transaction commenced by March 26, 2015.  Following negotiations in May 2015, SunEdison submitted an offer to acquire VSLR on June 3, 2015, and proposed an exclusive negotiating period to finalize the terms of the transaction.  After further negotiations leading to a preliminary agreement on the acquisition price, on June 8, 2015—the day before the closing of the Global Class D offering—SunEdison and VSLR signed a confidentiality agreement opening a four-week exclusive period to finalize the deal terms.  During those negotiations, SunEdison told VSLR that it lacked the liquidity necessary to complete the transaction on the terms agreed and would need to obtain substantial additional financing in order to consummate the transaction.  Notwithstanding the foregoing, SunEdison did not negotiate a financing contingency or condition.

132.    The July 20, 2015 announcement of the VSLR acquisition described the substantial financing that would be required to permit the merger to go forward, causing some investors to question whether SunEdison had the ability to raise the capital needed to complete the merger and also fund the acquisition, development and construction of the other projects needed to meet the high-growth expectations it had set for Global and TERP, and to do so on terms that would permit completed projects to be dropped down to the YieldCos at IRRs that would be sufficient to fund the CAFD and DPS growth Defendants had led the market to expect.  Market concern over the acquisition was heightened by the increased risks associated with residential solar, which was a significant shift in SunEdison's existing business that targeted commercial and industrial projects that had stronger counterparties and less risk.  TERP's failure to raise dividend guidance to the level that was imputed by the combined asset of VSLR and TERP further fueled concerns over the transaction.  These and other concerns over the deal caused the price of both SunEdison and TERP shares to decline significantly following the announcement of the VSLR acquisition.

133.    By the end of trading on July 21, 2015, the price of SunEdison Stock had fallen nearly 7% from its pre-announcement level to close at $29.37 per share while the price of TERP shares had fallen by more than 9% to close at $33.71 per share.

134.    Continued declines in the price of SunEdison and TERP shares led TERP to announce on July 27, 2015 that it would not issue new shares to finance the acquisition, but would instead do so with a combination of cash on hand and increased debt.  To further allay concerns, a conference call was convened that day in which TERP's CEO Domenech and CFO Alex Hernandez (a former Managing Director in the Investment Banking Division of Goldman Sachs) represented to investors that TERP and SunEdison had adequate liquidity to carry out all of the recently announced acquisitions.  Alex Hernandez asserted that TERP shares were "significantly

undervalued" as a result of recent market activity, which had resulted from "misconceptions [about the VSLR acquisition] that are apparent from a number of inquiries we have received." He asserted that the Company had "ample liquidity and a conservative capital structure," "full flexibility to deploy this liquidity to fund the pending transactions and the overall growth of our business," and the ability to do so "in a disciplined manner that is consistent with our financial policy and strategic objectives." Alex Hernandez also confirmed that TERP had sufficient cash flow to meet both its 2015 and 2016 dividend and CAFD guidance without issuing additional equity, asserted that its dividend forecasts were conservative, and claimed that its CAFD forecasts for the transaction were still reliable despite the increased debt required by the restructured deal announced on the call.

135. By the close of trading on July 31, 2015, the price of both SunEdison and TERP shares fell to $23.28 per share and $30.16 per share, respectively, triggering, or causing an imminent risk of triggering, a substantial margin call on the Margin Loan, which fact was not disclosed to investors.

136. By August 6, 2015, SunEdison Stock's price had dropped to $17.08 (the stock was trading over $31 prior to the announcement of the Vivint Solar Acquisition). That same day, SunEdison issued a press release announcing its financial results for the 2015 second quarter, reporting a loss of $263 million. The Company sustained a net loss of $.93 per share. SunEdison also reported that gross margins on the projects that the Company had sold to TERP were only 12.5%, a drastic cut from SunEdison's prior guidance of 18%. Furthermore, according to its financials, SunEdison's debt now stood at a whopping $11 billion, which included debt from a number of multi-billion dollar deals to acquire new wind and solar assets. Once again in the face of increasing debt and other serious issues plaguing the Company, Chatila assured investors, including the Plan Participants that:

> During the second quarter, we continued to balance operational execution while meeting our strategic objectives.  On the operations front, our leading organic development engine continues to execute as we exceeded our megawatt (MW) and Retained Cash Available for Distribution (CAFD) guidance, delivering 404 MW and $63 million, respectively.  In addition, TerraForm Power delivered $65 million of CAFD and continues to create value for shareholders with its leading DPS growth.  Finally, we have largely completed our platform transformation with the agreement to acquire Vivint Solar, a leader in residential solar, as well as the IPO of our Emerging Markets-focused asset ownership platform, TerraForm Global.

*See* August 6, 2015 Company Press Release.

137.    Despite the falling price of SunEdison Stock and adverse Company-specific news available in the public domain, such as the announcement of multi-million dollar losses, the heavy debt incurred by SunEdison, and criticism of the Company's prospects in light of the Vivint Solar Acquisition, Defendant-fiduciaries continued to take no action to protect the Plan Participants' interests, and continued to offer the imprudent SunEdison Stock Fund as a Plan option.

**E.      Unbeknownst to Investors SunEdison Borrows $169 Million from Goldman Sachs at an Astounding 15% Interest Rate to Finance the Acquisition of Global's Start-up Projects**

138.    On August 11, 2015, SunEdison entered into an agreement for the 15% Goldman Loan to borrow $169 million at a rate of 9.25% and pay the lender an origination fee of $9 million (5.3%), equating to an effective interest of 15% ***or more than 14 percentage points over the then-prevailing LIBOR one-year rate of 0.8467%***.  By comparison, the credit facilities adequately disclosed in SunEdison's 2Q15 Report on Form 10-Q required the Company to pay from 1.25 percentage points to 4.25 percentage points over LIBOR.

139.    Neither the existence of the loan nor its terms were disclosed publicly or to investors until three months later on November 9, 2015, when SunEdison filed its 3Q15 Report on Form 10-Q, which described the loan as follows:

> On August 11, 2015, we entered into a Second Lien Credit Agreement ("Second Lien Term Loan") with Goldman Sachs Bank USA ("Goldman Sachs") providing

for a term loan maturing on August 11, 2016, in an aggregate principal amount of
$169 million.  As of September 30, 2015, the current interest rate on the Term Loan
is 9.25%. … We paid fees of $9 million upon entry into the Second Lien Term Loan
which were recognized as deferred financing costs.

140.     On November 18, 2015, Deutsche Bank reported that SunEdison management had

admitted that the 15% Goldman Loan had been "structured in July as part of the portfolio formation

for the Global IPO.  The company entered into the loan in August as part of the initial agreement

in order to fund the construction of some of the international projects."

141.     Given the concerns of the market following the announcement of the VSLR

acquisition, any disclosure that SunEdison needed to borrow funds at 15% in order to fund

construction of the projects in Global's start-up portfolio would have immediately alerted investors

that SunEdison was unable to finance its projects at a reasonable cost and would not earn the

expected IRR or be able to return dividends to investors.  For these reasons, SunEdison Stock was

no longer a prudent investment, especially for retirement savings.  That SunEdison needed to

borrow funds at a 15% rate, at a time when the corporate borrowing rate was 5.19%, was a tacit

admission, or at a minimum a red flag, that the representation of SunEdison's financial strength,

liquidity and capital resources, and the benefits Global would derive as a result thereof, were false.

As a result, demand for Global's IPO shares, which had already fallen significantly following the

VSLR acquisition announcement, would have dissipated along with demand for any subsequent

offerings of SunEdison securities.

**F.     SunEdison Does Not Disclose a Breach of the
        Debt Covenants on the Margin Loan**

142.     The falling price of SunEdison and TERP shares following the July announcement

of the VSLR acquisition prompted large margin calls on the Margin Loan.  By August 4, 2015,

two days before 2Q15 earnings were announced, TERP shares had fallen nearly 14% below their

value on the day the Margin Loan was closed.  Thus, by the time of the 2Q15 call, the breach of the Margin Loan debt covenants had either already occurred or was imminent.

143.    The margin call was not publicly disclosed by Defendants at the time it occurred. On August 25, 2015, UBS reported that it had learned that a margin call had been made on the loan but had been satisfied by SunEdison and that UBS presumed it had been satisfied by pledging additional Class B shares as collateral.  SunEdison did not file a Report on Form 8-K with the SEC as required at the time it advised UBS of the Margin Loan breach and margin call and did not itself report the margin call until October 7, 2015, when it admitted that a $152 million call had previously been made on the Margin Loan and was satisfied by posting cash, not shares, as additional collateral.

144.    While Defendants did not disclose the source of the cash used to satisfy the call, the following facts indicate that the margin call was satisfied from the proceeds of the 15% Goldman Loan: (i) the 15% Goldman Loan was signed August 11, 2015, which would have been the deadline set by the Margin Loan agreement to cure the violation if the breach occurred on August 7, 2015;[9] (ii) the size of the loan ($169 million) is roughly the same as the size of the call ($152 million), which is consistent with the need to post additional collateral to provide a cushion to prevent further calls as the value of TERP common stock continued to fall; and (iii) Goldman Sachs was one of the brokers and lenders on the Margin Loan, and thus knew about the call and the need to raise money to satisfy it.  To the extent SunEdison satisfied the call by using the

---

[9]    Based on the 50% loan-to-value requirement and using the value of the Class B shares pledged to the loan (but not the value of the Class B units or IDR rights, which are unknown), the covenant appears to have been breached on or about August 7, 2015, when TERP's shares closed at $25.24 per share.  SunEdison has not disclosed the specific date of the breach.  However, based on the 32.2 million Class B shares originally pledged on the Margin Loan agreement and assuming a $410 million loan balance on August 7, 2015, the $25.24 closing price would have equated to a loan-to-value ratio of 50% ($410 million ÷ (32.2 million x $25.24)).

proceeds of the 15% Goldman Loan, the disclosure of SunEdison's inability to satisfy the call absent borrowing funds at an extraordinary 15% interest rate would have caused investors to disbelieve Defendants' statements about the Company's liquidity, efficient use of capital and financial strength, and to discredit the defendants' bullish outlook for the business.

**G.    SunEdison Sells $650 Million in Preferred Stock Without Disclosing the 15% Goldman Loan, the Breach of the Margin Loan and Worsening Liquidity Risks to Investors**

145.    On August 12, 2015, SunEdison announced the syndication of an additional $280 million seven-year term loan for the TERP warehouse facility.  The proceeds were added to the warehouse facility formed in connection with the Atlantic Power acquisition, increasing the warehouse facility to $525 million.  Later that day, SunEdison announced that it would sell 50% of the cash equity (and 99% of the tax equity) on a 420 MW solar project on TERP's call rights list (the Four Brothers project in Utah) for $500 million to Dominion Resources to raise the capital needed to complete development and construction of the project.  Both of these announcements misrepresented that SunEdison's financial condition remained strong and it had the ability to raise the capital necessary to fund project development and meet forecast MW, CAFD and DPS growth at its YieldCos, causing the price of both SunEdison and TERP shares to rise.

146.    In an interview with Christopher Martin for *Bloomberg Technology* on September 2, 2015 at SunEdison's office in Belmont, California, Chatila stated that "[t]he most important question for investors is when do we start generating cash for a living," adding that he had previously "said it's at the end of 2016 or early 2017," SunEdison had recently "been signaling it's going to be a lot sooner than that, probably early 2016 or late 2015."  On September 3, 2015, Chatila's assurances drove up the price of SunEdison Stock approximately 11% to a close of $11.94.  As subsequently reported by the *Wall Street Journal* April 14, 2016 piece, however, "an

internal presentation to SunEdison's [B]oard showed the company wouldn't have positive cash flow until at least the second quarter of 2016. Senior executives read the Bloomberg story agape."

147.    On September 8, 2015, SunEdison announced that an agreement had been reached to form a partnership with unnamed institutional investors advised by JP Morgan to provide equity to purchase projects developed by SunEdison at "an agreed upfront development margin." Financial terms of the arrangement were not disclosed.  SunEdison said that the partnership agreement would provide $300 million to fund the purchase of a 33% interest in a 425 MW portfolio of solar assets owned by Dominion Resources.  SunEdison's press release went on to state:

> The partnership also contemplates the acquisition of new development projects into mid-2016, providing an ongoing source of capital for SunEdison projects ready to go into construction or operation. "This partnership supports SunEdison's growth strategy while strengthening our liquidity," said Paul Gaynor, executive vice president of SunEdison's EMEA and Americas business unit.  "Attracting strong investors such as J.P. Morgan Asset Management reinforces the breadth and depth of demand for ownership of renewable energy assets."

148.    Also on September 8, 2015, SunEdison announced another joint venture agreement with Dominion Resources to invest $320 million to develop the 265 MW Three Cedars solar project in Utah, on terms similar to the previously announced joint venture on the Four Brothers project, and told investors it would finance the balance of the capital through a loan from Deutsche Bank.

149.    On October 1, 2015, analysts at CreditSights disclosed that a margin call on a $410 million SunEdison "non-recourse" margin loan that SunEdison carried may have been triggered, which would wipe out a large portion of SunEdison's available cash.  That day SunEdison Stock's price closed at $7.20.  Still, the Defendant-fiduciaries continued to do nothing to protect the Plan's assets invested in SunEdison Stock.

150.    Furthermore, Defendants continued to make misrepresentations concerning the strength of its financial condition, even as it filed its Form 8-K with the SEC on October 5, 2015, announcing layoffs of 15% of its workforce and restricting charges of $30 to $40 million for Q3 2015 through Q1 2016.  The October 5, 2015 Form 8-K reported that on September 29, 2015, the SunEdison Board approved the management's plan to reorganize.  However, the October 5, 2015 Form 8-K misrepresented the purpose of these layoffs as a vehicle to "optimize business operations in alignment with current and future market opportunities, and accelerate cash flow positive operations."  In reality, the Company did not have the cash flow to sustain its operations.

151.    The next day, on October 6, 2015, the *Wall Street Journal* reported in an article entitled "SunEdison Won't Complete $700 Million Buyout of Latin America Power" that as its "woes mount[ed]," SunEdison failed to make a required $400 million upfront payment for a roughly $700 million planned acquisition of Latin American Power ("LAP").  The article noted that attorneys for LAP stated that SunEdison was in breach of its obligations under the deal.  That day, SunEdison Stock closed at $8.69.

152.    In a call with investors on October 7, 2015, however, Chatila disputed that SunEdison was at fault, claiming that "[t]he seller there did not satisfy the conditions precedent" to closure of the deal, "[s]o instead of trying to fix it, remedying it, [SunEdison was] saying that the agreement [wa]s terminated."

153.    LAP would later petition the New York Supreme Court for an order of attachment to remedy the breach.[10] In its February 10, 2016 petition, LAP shareholders sought to attach assets, accounts, and other property held by SunEdison and TERP in satisfaction of LAP's $150 million

---

[10]    *BTG Pactual Brazil Infrastructure Fund II, L.P., et al. v. SunEdison, Inc., et al.*, Index No. 650676/2016 (Sup. Ct. N.Y. Cnty.  Feb. 10, 2016).

claim. The petition alleged that "In numerous meetings, phone calls, and emails thereafter, the highest levels of Respondents' management—including SunEdison, Inc. CEO Ahmad Chatila, SunEdison, Inc. CFO Brian Wuebbels, TerraForm CEO Carlos Domenech, and TerraForm CFO Alex Hernandez—reassured LAP and the LAP Shareholders that closing was to proceed as scheduled on September 23 and that they intended for SunEdison Holdings to comply with its payment obligations under the Purchase Agreement."  The petition cited a Deutsche Bank report claiming that SunEdison was "laden with debt," and observed that "in an apparent attempt to burnish their third quarter end balance sheet, [SunEdison and TERP] requested that they be permitted to delay paying the full amount of certain payments on September 30 and instead defer $125 million of that amount until two days later, to October 2."  While SunEdison signed the closing documents, it never made a single payment.  On October 1, LAP terminated the Purchase Agreement and delivered to SunEdison a formal dispute notice, notifying it of intent to initiate arbitration proceedings.

154.    The October 1, 2015 disclosure of the margin call on SunEdison's loan and the October 5, 2015 announcement of the Company layoffs, as well as the continually falling Company Stock price, were additional red flags that should have prompted Defendants to investigate the continued prudence of retaining SunEdison Stock as a Plan investment.  Yet, Defendants did no such investigation, ignored the mountain of information available to them demonstrating the imprudence of allowing Plan Participants to remain invested in SunEdison Stock, and continued to maintain the SunEdison Stock Fund in the Plan.

155.    Following the Company's October 5, 2015 announcement of massive lay-offs, SunEdison Stock price continued its downward spiral, thereby decimating the value of the Plan Participants' retirement savings.

156.    On October 7, 2015, SunEdison disclosed that it was lowering its guidance for 2016, and announced in a press release that it would not sell any projects to TERP or Global that year.  In a Business Update presentation released to investors that same day, SunEdison described a "market dislocation" that had become apparent in the YieldCo space, noting the recent extremely poor performance of both SunEdison's and TERP's respective stock prices.  Defendant Chatila announced on a call with analysts that SunEdison would "pivot to third-party sales" because there was "a disconnect between the value of these underlying assets and what people are willing to pay for them in a yieldco."  Even worse, defendant Chatila announced that SunEdison planned to reduce expansion plans in Latin America and other emerging markets, which were the YieldCos' geographic focus.  Defendant Chatila explained that SunEdison "de-emphasized countries, consolidated divisions and walked away from things that didn't make sense in the current dislocation in the market."  In other words, the project acquisition strategy upon which the YieldCos depended to effectuate SunEdison's business plan would not be carried out.

157.    Even at this dire time, however, Wuebbels continued to do nothing to protect the Plan from suffering losses.  On an October 7, 2015 call with investors concerning SunEdison's recently announced "Global Initiative To Optimally Position The Company For Long Term Profitable Growth," Wuebbels claimed that "excluding the cash from TerraForm and Global, the cash available at the standalone DevCo, was standing at approximately $1.4 billion at the end of the quarter, up from $900 million at the end of the second quarter." Slide 10 in the accompanying deck touted the "Strong Liquidity Position at DevCo" and claimed Q3 ending cash of $1.38 billion. On that same call, Chatila claimed that SunEdison was "well capitalized with adequate liquidity" and its "optimized economic engine positions us with cash-generating ability that exceeds the liabilities of the business."

158.    On October 8, 2015, *SeekingAlpha* issued another article entitled "SunEdison:  Is Bankruptcy Possible," noting that SunEdison's cash expenditures are "clearly unsustainable" with the Company burning "around $3.5 billion in the last four quarters."  The article also noted that "SunEdison is over-leveraged" with "shareholders equity of only $632 million and total liabilities of $16,925 million, it is possible to calculate a debt to equity ratio of 26:78."  The results "severely call into question the health of the Vivint Solar organization (especially in the context of strong results from Sunrun and SolarCity)" wrote Credit Suisse's Patrick Jobin.  Jobin described the Company's likely acquisition as follows:

> The decline in volumes and likely guidance miss, in addition to the weakening financial position (debt raises challenged recently), indicates troubles either organizationally or as a consequence of the pending acquisition by SunEdison which is supposed to close Q4-Q-1.  While no shareholder vote has been scheduled to approve the merger, it appears financial underperformance is not a MAC to get out of the deal.  While TerraForm is actively trying to sell the operating assets upon acquisition, one must as further questions about the strength of the development engine SunEdison is acquiring.

159.    Deutsche Bank's Vishal Shah likewise cut his price target on SunEdison, noting that the Company's Form 10-Q included "language around SUNE debt financing" that "could concern some investors who are focused on the balance sheet, while opex needs could complicate SUNE's ~$150M/Q Guidance."

160.    On October 22, 2015, Chatila informed Vivint that SunEdison's Audit Committee of the Board had serious misgivings about the economics of the merger in light of the prevailing market conditions for both SunEdison and Vivint.  SunEdison was in a severe liquidity crunch and was in danger of not being able to carry out the merger on the agreed upon terms.  As the facts demonstrate, during the Relevant Period, Defendants knew about SunEdison's dire financial condition, yet failed to take any action whatsoever to protect the Plan Participants.

161.    Chatila was acutely aware of SunEdison's liquidity crunch at this time.  As alleged by Vivint in a complaint seeking relief for breach of contract that it filed against SunEdison in the Court of Chancery of the State of Delaware on March 8, 2016 (*Vivint Solar, Inc. v. SunEdison Inc., et al.*, C.A. No. 12088 (Del. Ch.  Mar. 8, 2016)), "in late October [2015] . . . Chatila also asked Butterfield for help in seeking financing from the Blackstone Group to help redress some of SunEdison's own capital issues."

162.    On the November 10, 2015 earnings call for 3Q15, which featured Chatila, Wuebbels, and Morris, Wuebbels reported that SunEdison had "approximately $1.4 billion as of the end of the quarter." The accompanying slide deck also set forth this $1.4 billion figure. As noted above, the *Wall Street Journal* on April 14, 2016 reported that, according to an internal report, SunEdison had only $90 million in available cash at that time, and "[t]he discrepancies troubled some senior officials, who raised concerns to SunEdison board members, according to people familiar with the matter. They said SunEdison was running out of money and wasn't being honest with investors about its financial problems."  The November 9, 2015 Form 10-Q likewise claimed that SunEdison "had access to" $1.3 billion in cash and cash equivalents and sufficient liquidity to operate for the following year.

163.    In November 2015, SunEdison disclosed among other things:  (a) drastically lower margins on retained projects than had been forecast; (b) significant funding issues with two separate transactions; (c) the re-categorization of over $700 million in "non-recourse" debt (including the $410 million Margin Loan and the Exchangeable Notes) to "recourse," meaning the lenders could recover the amounts due directly from SunEdison; and (d) that it had taken out an emergency $170 million loan from Goldman Sachs on August 11, 2015, at a staggering effective

interest rate of 15%.  At the beginning of November 2015, the stock traded at $7.77 per share; by November 30, 2015, the stock dropped by 59% to $3.19 per share.

164.     On this troubling news, investors quickly sold SunEdison Stock, with several prominent hedge funds, such as Daniel Loeb's Third Point, selling their entire positions.  Yet, Defendants continued to maintain the SunEdison Stock Fund in the Plan to the detriment of the Plan Participants.  During the Relevant Period, Defendants took no action to protect the Plan and its Participants from, *inter alia*, not purchasing additional shares Company Stock, discontinuing the option of allowing SunEdison Stock as an investment for Plan Participants, and/or recommending that Plan Participants sell SunEdison Stock.

165.     On February 29, 2016, SunEdison filed a Form 12b-25 regarding the delayed filing of SunEdison's Annual Report on Form 10-K for the year ended December 31, 2015. Defendants disclosed that, beginning in late 2015, SunEdison's Audit Committee, with the help of independent advisors, investigated allegations concerning the accuracy of SunEdison's anticipated financial position based on certain issues raised by former executives and current and former employees of SunEdison. As of the end of February 2016, notwithstanding everything alleged herein, SunEdison reported that this investigation has not discovered any wrongdoing.

166.     On April 3, 2016, Global filed the Global/SunEdison Action in the Chancery Court of the State of Delaware. On April 4, 2016, the next trading day, news of the Global/SunEdison Action broke.  Global's complaint alleged claims for "breach of fiduciary duty, breach of contract and unjust enrichment, to remedy SunEdison's misappropriation of $231 in cash from Global." Global claimed that SunEdison had solicited funds from Global based on representations that the payments were necessary to prevent certain projects in India, which were to "drop down" to Global after completion, from failing, when in fact SunEdison needed the money to close the Vivint deal,

as well as for collateral for the Margin Loan because of decline in the value of TERP stock due to crashing hydrocarbon prices.

167.   Global further alleged that SunEdison had sought to renegotiate the Vivint acquisition, and that as of November 18, 2015, TERP's conflicts committee—which existed to ensure that transactions involving SunEdison, TERP's controlling shareholder, were fair to Global's minority shareholders—was still reviewing proposed revisions to the Vivint acquisition, casting doubt as to whether that transaction would go forward. At the same time, Global executives had their own concerns about SunEdison:

> In light of SunEdison's stated need for cash, as well as published reports raising concerns about SunEdison's liquidity, in or about late October 2015, Domenech, Hernandez, and Perez raised concerns with SunEdison's Board about the extent of SunEdison's liquidity and the accuracy of SunEdison's public statements regarding its financial condition.

168.   Global alleged that on November 18, 2015 the conflicts committees of both TERP and Global determined that they could not complete any transactions with SunEdison to provide the $100 million SunEdison was seeking, and that SunEdison subsequently convened the TERP and Global boards on November 19, 2015 for purposes of replacing the YieldCos' senior managers and members of the conflicts committees with the stated goal of obtaining "a decision from TERP —positive or negative—on the request for approval of the revised terms for the proposed Vivint transaction." That same day, SunEdison attorney Sujay Parikh ("Parikh") prepared a draft Purchase and Sale Agreement ("PSA") calling for a large payment from Global to SunEdison in exchange for completion of certain projects in India that were to "drop down" to Global in the near term. Global alleged that Chatila then called a meeting for the following day, whereat he, Truong, and Parikh pitched "a false, misleading, and one-sided recitation" of the proposed "maneuvers"

contemplated by the PSA to the newly installed Global conflict committee members, namely: Blackmore, Chris Compton ("Compton"), and Jack Jenkins-Stark ("Jenkins-Stark").

169.     Global alleged that Chatila, Truong, and Parikh did not disclose the call on the Margin Loan that needed to be satisfied by close of business on November 20, 2015, and that Blackmore, Compton, and Jenkins-Stark agreed to the PSA based on a mistaken belief that the India projects were contingent upon its adoption.  Wuebbels subsequently, allegedly caused $150 million to be wired from Global to SunEdison that day, which was used to satisfy the Margin Loan call.  An additional $81 million was wired from Global to SunEdison on December 1, 2015 after Global and SunEdison had entered into an amended PSA that purportedly provided for liquidated damages and a provision setting the final purchase price of the India projects.

170.     One defense advanced by Chatila, Truong, and Wuebbels in their answer is that the contracts did not provide for use restrictions for the funds.

171.     The complaint in the Global/SunEdison Action was signed by Blackmore, who had served on SunEdison's Board for nearly a decade prior to joining the YieldCos' conflicts committees.

172.     Upon the filing of the complaint in the Global/SunEdison Action, share prices of SunEdison Stock lost half their value, closing at a mere $0.21 on April 4, 2016, down from the prior day's close of $0.43.

173.     The intrigue, however, did not end there.  The *day after* Global filed the complaint in the Global/SunEdison Action, it also produced documents to a shareholder pursuant to a written demand to inspect Global's books and records that the shareholder had made on January 22, 2016. That shareholder would later commence a derivative action alleging that Blackmore, Compton, and Jenkins-Stark, as well as Global director Hanif Dahya, had breached their fiduciary duties to

Global's minority shareholders by approving the PSA.[11]  The Global Derivative Action alleged that, contrary to the contentions of Blackmore, Compton, and Jenkins-Stark, those individuals had been specifically installed by SunEdison, in its capacity as controlling shareholder of the YieldCos, in order to approve the PSAs and secure funding to satisfy the Margin Loan call.

174.   The Global Derivative Action pointed to a series of red flags that should have alerted not only the Global conflicts committee, but also Defendants, in their capacity as Plan fiduciaries and individuals responsible for overseeing the Investment Committee, to the fact that SunEdison Stock was not a prudent investment:

- Former Global board members Perez, Mark Florian ("Florian") and Mark Lerdal ("Lerdal") in protestation of SunEdison's unilateral enlargement of the Global board to include Blackmore, Compton, and Jenkins-Stark on November 20, 2015;

- The replacement of the old conflicts committees with Blackmore, Compton, and Jenkins-Stark;

- Resignation letters, from Florian and Lerdal to Blackmore, identifying the Global's board's actions on November 20, 2015 as the reason for their resignation;

- Immediate pressure by SunEdison executives on the new Global conflicts committee to approve a related-party transaction;

- Blackmore's resignation from the Board, on which he had served for nine years;

- The fact that the PSA presenters were all SunEdison insiders; and

---

[11]   *Aldridge v. Blackmore, et al.*, C.A. No. 12196-VCL (Del. Ch. Apr. 12, 2016) (the "Global Derivative Action").

- The PSA presenters' insistence that the new conflicts board approve the PSA without consulting independent financial or legal advisors.

175.   The Global Derivative Action noted that Blackmore, Compton, and Jenkins-Stark approved the PSA notwithstanding SunEdison's liquidity problems and other troubles, as "widely reported in, for example:

(a)   An August 6, 2015 *Motley Fool* article entitled 'SunEdison's Losses Become a Red Flag for Investors';

(b)   An August 20, 2015 article by Jim Cramer on CNBC entitled 'Kramer: Mea Culpa! Why I Was Wrong on SunEdison';

(c)   An August 31, 2015 article in *The New York Times* entitled 'Greenlight Capital down 14% For the Year,' noting the hedge fund's huge losses on SunEdison and stating 'in August, [SunEdison] stock took a sharp dive and is now trading at $10.40 a share';

(d)   An October 2, 2015 *ValueWalk* article entitled 'SunEdison May Have Experienced Margin Call Says CreditSights';

(e)   An October 7, 2015 article in *The Wall Street Journal* entitled 'SunEdison, Shares Fizzling, Promises a New Strategy,' which stated that '[SunEdison] has failed to turn a profit for the last 2½ years, but financial performance in recent quarters has gotten worse.  This year's second-quarter loss was $263 million, or 89 cents a share.'  The article ominously warned 'SunEdison's woes illustrate how fortunes can quickly change for a money-losing company when investors grow skeptical';

(f)   A November 10, 2015 *Bloomberg* article entitled 'SunEdison Posts Wider Loss as CEO Slows Growth, Seeks Cash,' which discussed SunEdison's continued

financial woes, and stated that '…SunEdison's loss of 92 cents a share was bigger than the 65 cent average of 13 analyst's [sic] estimates compiled by Bloomberg.'  The article concluded 'SunEdison slumped 22 percent to $5.77 at the close in New York, the lowest since May 2013';

(g)      A November 11, 2015 *Business Insider* article entitled 'SunEdison is Getting Crushed,' which set forth the company's various upcoming cash commitments and noted '[T]he stock price started falling this summer. The stock is down 75% year-to-date';

(h)      A November 16, 2015 *Bloomberg Markets* article entitled 'SunEdison – Now with $739 Million in Extra Recourse Debt?' which noted that CreditSights' analysts Andy Devries and Greg Jones argued that the precipitous fall in one of its yieldcos's share price means that SunEdison now faces a collateral call of a $410 million loan secured by TerraForm stock'; and

(i)      A November 17, 2015 *YahooFinance* article entitled 'SunEdison is getting butchered,' which noted that 'SunEdison has had to pay $152 million towards a margin loan for one of its yieldcos, TerraForm.'"

176.    The Global Derivative Action further alleged that Blackmore, Compton, and Jenkins-Stark had approved the PSA in bad faith, thereby squandering $231 million in corporate assets. Many of the material allegations in the Global Derivative Action were known to Wuebbels, Chatila, and Blackmore, who did nothing to divest, or cause the Investment Committee to divest, Plan assets from the SunEdison stock fund.

177.    On April 21, 2016, SunEdison, as well as twenty-five related entities, filed petitions for relief in the Bankruptcy Court.

178.    During the bankruptcy proceedings, it became clear that the need to file for bankruptcy protection and file for Chapter 11 had been contemplated for some time as the Company was hopelessly insolvent and had been for some time.  See *In The Matter of SunEdison, Inc. et al.*, 16-10992 (SMB) (Dock. No. 3804: Memorandum Decision and Order Overruling Shareholder Objections to Confirmation of the Debtors' Joint Plan).    Counsel for SunEdison explained at the start of the bankruptcy proceedings that:

> [T]he company tried on its own, over the last year or so, to manage through this liquidity challenge, but ultimately, we came to the conclusion that the right thing to do to save this business and to maximize the value for all the stakeholders, was to utilize Chapter 11 to create an orderly process leading to a reorganization.

*In The Matter of SunEdison, Inc. et al.*, 16-10992 (SMB), Debtors' Motion for Joint Administration of the Chapter 11 Cases, Dock.. No. 147 at 19:8-22.

179.    At long last, in the following two months, Wuebbels and Chatila left SunEdison, when the former was terminated on May 10, 2016 and the latter resigned on June 22, 2016 (having resigned from the boards of TERP and Global on May 26, 2016).

## H.    SunEdison Stock Was an Imprudent Investment During the Relevant Period Due to the Company's Changed Circumstances

180.    As discussed above, prior to and during the Relevant Period, SunEdison incurred a gargantuan amount of debt to fund its operations.  In particular, SunEdison's debt load reached $11.7 billion by the end of the third quarter of 2015.  This debt threatened the Company's liquidity and its ability to stay solvent.

181.    The liquidity risks facing SunEdison were widely reported during the Relevant Period and were known or should have been well known to Defendant-fiduciaries, who nonetheless failed to investigate the continued prudence of investing Plan assets in SunEdison Stock and failed to act to protect the Plan Participants' assets invested in SunEdison Stock.

182.     As alleged above, on August 6, 2015, SunEdison issued a press release, filed with the SEC as an exhibit to the Form 8-K, reporting results of its operations for the 2015 second quarter.  The results were dismal and should have alerted Defendant-fiduciaries (among other warning signs alleged herein that were already out in the public domain) of the need to investigate the prudence of maintaining the SunEdison Stock Fund as a Plan Investment.  In particular, SunEdison reported a loss of $263 million in its second quarter.  Additionally, SunEdison stated it had a loss of 93 cents per share.  SunEdison also reported that gross margins on the projects that the Company had sold to TERP were only 12.5% (down from SunEdison's prior guidance of 18%).

183.     The market reacted poorly to SunEdison's announcement of its 2015 second quarter earnings:

> NEW YORK (*The Street*) -- SunEdison (SUNE - Get Report) shares are down by 12.90% to $19.92 in early market trading on Thursday, following the release of the solar energy company's 2015 second quarter earnings results.
>
> The company reported a net loss of $263 million, or a loss of 93 cents per share on an adjusted basis on revenue that rose 5.6% to $455 million for the quarter.
>
> *     *     *
>
> Separately, TheStreet Ratings team rates SUNEDISON INC as a Sell with a ratings score of D+. TheStreet Ratings Team has this to say about their recommendation:
>
> "***We rate SUNEDISON INC (SUNE) a SELL****. **This is driven by a number of negative factors, which we believe should have a greater impact than any strengths, and could make it more difficult for investors to achieve positive results compared to most of the stocks we cover. The company's weaknesses can be seen in multiple areas, such as its generally high debt management risk and weak operating cash flow*."

*See* "SunEdison (SUNE) Stock Falling Following Earnings Results," *The Street*, Aug. 6, 2015 (emphasis added).  SunEdison Stock closed at $17.08 on August 6, 2015.

184.     On the same day that SunEdison released its 2015 second quarter earnings, alarms rang in the financial press that instead of building a successful renewable energy conglomerate, the Company was actually building nothing more than a "house of cards":

Debt could be too much for this renewable energy giant to overcome.

In a quarter when its competitors wowed investors with better than expected profits, SunEdison (NYSE: SUNE) is plunging after another massive quarterly loss.

*The loss itself shouldn't surprise anyone who follows SunEdison, but it highlights how tough it's going to be to build a renewable energy powerhouse with nearly $11 billion in debt and negative cash flow from operations. The market is finally starting to realize that this high-profile renewable energy powerhouse may actually be building a house of cards.*

**Constructing a renewable energy giant**

*What SunEdison has sold to investors over the past few years is that it can build a massive renewable energy company that can play in nearly every end market in every geography around the world.* The company has built an 8.1 GW pipeline of projects with 1.9 GW under construction on top of 404 MW finished in the second quarter. Those are impressive numbers no matter who is building them.

*But building that scale has been costly for SunEdison. The company has a $10.7 billion debt load and continual losses quarter after quarter.* Case in point was a loss of $263 million in the second quarter of 2015 on $455 million of revenue.

*There are a few alarming numbers in last quarter's report besides the loss.* First is that marketing and administration costs were $259 million, more than two and a half times the $103 million gross margin the company generated. On top of that, interest expense was $146 million, again more than gross margin.

*With losses mounting and debt piling up, the only way for SunEdison to get out from under the pressure is to build more projects even faster with even more debt.* It's the only path to potential profitability, but it's fraught with risk if interest rates rise or competitors with better technology begin winning projects. Given First Solar and SunPower's profitable results over the last two weeks, I think that second concern is bigger than SunEdison wants to admit.

**TerraForm Power paying money it doesn't have**

*You could say that SunEdison is just pushing projects down to its yieldco, TerraForm Power* (NASDAQ: TERP), which will monetize projects long term.

*That's true, and it has grown cash available for distribution (CAFD), but again, it's starting to look like a house of cards.*

TerraForm Power's CAFD for Q2 was reported to be $65 million, and it paid a dividend of $0.335 per share.  But cash provided by operations was just $45.9 million, and net income was just $29.1 million. On top of that, the company has $2.3 billion of debt to pay for with the cash flow.

At the very least, TerraForm Power is being aggressive about what it pays to shareholders and SunEdison, who owns all of its incentive distribution rights, and it is willing to leverage the balance sheet to do that.

**Beware buying the biggest in renewable energy**

*SunEdison likes to tout itself as the biggest company in renewable energy, but it's far from the most profitable, despite having one of the biggest debt loads in the industry.* That concerns me as an investor, and I don't see any sort of sustainable advantage for the company in renewable energy right now. SunEdison uses commodity solar panels, wind turbines manufactured by large conglomerates, and even battery storage that's a commodity.

*I'm not sure that's a path to success in renewable energy, and nearly $11 billion in debt is enough to scare me far away from this stock.*

See "SunEdison's Losses Become a Red Flag for Investors," *The Motley Fool*, Aug. 6, 2015 (emphasis added).

185.   The massive losses reported by SunEdison for its second 2015 quarter, the significant Company Stock price decline, as well as media reports that the Company was based on nothing but a "house of cards" because of among other things, SunEdison's massive debt load and weak operating cash flow, should have prompted Defendants to investigate and take protective action with respect to the Plan's investment in SunEdison Stock.  Had a proper investigation been conducted, a prudent fiduciary would have determined that SunEdison Stock was no longer a prudent retirement investment for the Plan's Participants.  However, Defendants did no reasonable investigation and instead continued to offer the SunEdison Stock Fund as a Plan investment option, in derogation of their ERISA duties.

186.    At the same time, investor demand for energy stock was unexpectedly weak, with many energy investors (particularly hedge funds) retrenching in light of the combined collapses of the oil and equities markets and an increasingly negative shift in attitudes towards yieldcos.  *See* J.P. Morgan, North America Equity Research, *SunEdison, Inc.—In Light of Current Events: Initiating at Overweight*, at 4 (Aug. 31, 2015).   In fact, the stock price of SUNE competitor NRG Energy Inc.'s yieldco—NRG Yield Inc.—shares plunged nearly 70% between June and October 2015.  *See* Keith Goldberg, *Yieldco Bubble Set To Pop For Clean Energy Cos.*, LAW360 (Oct. 8, 2015).

187.    On November 10, 2015, SunEdison issued a press release, filed with the SEC as an exhibit to the Form 8-K, reporting results of its operations for the third quarter ended September 30, 2015.  As the second quarter results, these results were also nothing but dismal.  SunEdison incurred a loss of 92 cents per share from continuing operations for the third-quarter 2015, much wider than the year-ago quarter loss of 77 cents.  The Company's general and administration expenses increased about 135% to $296 million. Moreover, interest expenses doubled to $214 million because of higher debt.  Therefore, SunEdison posted a loss from continuing operations of $287 million or 92 cents per share compared with a loss of $204 million or 77 cents posted in the third quarter of 2014.

188.    On the same day, SunEdison released its third quarter 2015 results, *Reuters* reported that:

> Nov. 10, 2015 (*Reuters*) -- Shares of SunEdison Inc slid 24 percent to a nearly two-and-a-half-year low on Tuesday after the U.S. solar company posted a wider-than-expected loss, **raising fresh concerns about its ability to fund its operations, projects and acquisitions**.
>
> The stock was down $1.49, or 20.1 percent, at $5.91 in midday trade on the New York Stock Exchange.  The stock has lost 82 percent of its value since hitting a year high of $33.44 on July 20.

The company also said it would stop selling projects to its two "yieldcos" - bundles of solar, wind or other power assets it spun off into dividend-paying public entities.

The yieldcos had become an important source of funding for SunEdison.  The solar industry bellwether said in its quarterly report on Monday that there were no assurances it would be able to raise the $6.5 billion to $8.8 billion needed to fund the construction of renewable energy assets through 2016. …

*See* "SunEdison shares slide 24 percent on liquidity fears," *Reuters*, Nov. 10, 2015 (emphasis added).

189.    The following day, on November 11, 2015, *Business Insider* reported that:

Renewable-energy firm SunEdison is down 14% after the company disclosed a number of cash commitments in its quarterly earnings report.

Here are the details:

- According to an agreement SunEdison made in September, it has bought $100 million worth of TerraForm Global stock from one of its partners, Renova, in March 2016. TerraForm Global is down 4.2%.

- It also may have to buy $4 billion worth of wind-farm projects from Renova.

- Meanwhile, another SunEdison affiliate, TerraForm Power, could be required to buy 450 megawatts of completed Vivint projects in 2016, and up to 500 megawatts per year from 2017 to 2020 from SunEdison.

- TerraForm Power is also obligated to pay $580.3 million of assets for some residential projects. TerraForm Power is down 4.3%.

That's a lot of cash.

SunEdison has been hurting some of Wall Street's biggest names since the stock price started falling this summer. The stock is down 75% year-to-date.

David Einhorn of Greenlight Capital, and Leon Cooperman of Omega Advisors, have taken a hit. In August, Cooperman asked SunEdison executives if they would buy back some stock to stop the bleeding.

He said: "Is there a massive change in the absolute relative prices of a number of your entities you're involved with?  Does this create an opportunity for you creating additional value for shareholders by capitalizing on the short-term pessimism in midterm market or is that financial resource pretty much earmarked for reinvestment in the business?"

In plain English, Cooperman was hoping that the company might embark on stock buybacks.  The answer was "no" then, and given these disclosures regarding the company's hefty cash commitments, it's probably "no" now, too.

*See* "SunEdison is getting obliterated," *Business Insider*, Nov. 11, 2015.

190.   In the meantime, despite the additional red flags raised by the third quarter 2015 results regarding the Company's business and prospects and the negative commentaries in the financial press, the Defendant-fiduciaries continued to offer the SunEdison Stock Fund as a Plan investment option, made no reasonable investigation of the prudence of continued investment of Plan assets in SunEdison Stock and took no protective action with regard to the Plan's assets invested in SunEdison Stock.

191.   On November 19, 2015, following the release of SunEdison's financial results for the third quarter of 2015, *Real Money* reported that:

How did the former darling of the S&P 500 sink so low?  It seems the company cannot catch a break, as liquidity concerns have caught the attention [of] Wall Street analysts as well as hedge funds, who pared down their position in the company.  The Missouri-based renewable energy company develops, builds and operates solar and wind power plants.   As part of its business, the company spun off two companies – TerraForm Global (GLBL) and TerraForm Power (TERP), both YieldCos – to operate its projects.  As of Wednesday's market close, its stock price has fallen 83% this year to $3.25 from $19.74.

"The company overextended itself, continuing to make big acquisitions even when it became clear that the market had turned against them," Jim Cramer said of the company in August as the stock was already in freefall.

Recent news hasn't been much better for SunEdison.  The company's disappointing third-quarter earnings, released on November 10, raised questions about its ability to meet current obligations.

The reality is this:  SunEdison's debt went from $2.6 billion to $11.7 billion currently," Gordon Johnson of Axiom Capital Management told Real Money.  "A lot of that debt was due to the purchase of companies and projects they intended to drop down to the YieldCo.  They can no longer do that so the question is can they sell that stuff into the open market at accretive margins?"

The company's current ratio, which measures current assets vs. current liabilities, stands at 1.3, below the 1.5 to 2.0 range considered prudent by stock analysts.

Axiom also takes issue with the company meeting its targets and how it measures – and discloses – its margins.  In October, SunEdison said it planned to sell projects at 18% to 19% gross margin, but it reported that the projects were actually sold at 15%.  Making matters worse, SunEdison said that the project excluded equipment, according to James Bardowski of Axiom.

"When you include the full solar system, they actually sold it at 9.6% gross margin – far below what they told everyone a month prior," Bardowski told Real Money.

Also concerning analysts is a $160 million loan SunEdison received from Goldman Sachs.  Axiom as well as other analysts believe the loan was used to pay off another loan from Deutsche Bank.  The company stated an interest rate on the loan of 9.25%, but paid a hefty origination fee, which made the effective rate closer to 15% — a high rate for short-term financing.

"There's an absence of transparency in their financials," said Doug Kass, of Seabreeze Partners Management and columnist for Real Money Pro.  In reference to the company's sales figures as well as the Goldman Sacks loan.

While fundamental issues about the company's sustainability persist, SunEdison has also taken several other hits this week.  On Monday, as hedge funds submitted their 13Fs, it was revealed that several, including David Einhorn's Greenlight Capital and Dan Loeb's Third Point, significantly pared down or completely exited their positions in SunEdison during the third quarter.  Share of stock plummeted 33% on Tuesday, in response to the news.

Adding to the pile, on Wednesday its shares were halted as the price shot up as high as 19% on a rumor that Blackstone was going to invest in SunEdison's debt.  When those rumors proved to be untrue, the stock fell in after-hours trading.

*See* "Will Troubled SunEdison Need to Raise More Equity?," *Real Money*, Nov. 19, 2015

(emphasis added).

192.   *Barron's* also echoed the analysts' concerns regarding SunEdison's liquidity, as

well as analyst downgrades of SunEdison Stock:

UBS dropped its price target to $3 a share from $6 on Wednesday.  Analyst Julien Dumoulin-Smith explained:

We value SUNE on a SOTP [sum of the parts] basis using a combination of EV/EBITDA and DCF [distributable cash flow' approaches plus the market value of LP ownership stakes in TERP and GLBL.  We no longer assign any credit for GP incentive distribution rights (~$2/sh previously) and we now subtract the value of -$169M of expensive (9.25%) term loans taken out in August as disclosed in the most recent 10Q (another $0.50).  We've decreased Vivint Solar (VSLR)'s cash balance from ~$150 mn to $82 mn per the earnings update. It remains unclear the new sale price for the VSLR assets to TERP via SUNE (who is responsible for pricing this sale, presumably driving further downgrade if unable to receive relief on VSLR terms).

*SUNE shares have been sliding this month following third quarter results that raised questions about its liquidity and ability to afford all its recent acquisitions. Reports that hedge funds were unloading their holdings in the third quarter and that management was not providing answers to analysts' questions have made matters worse.*

*See* "SunEdison Closes Below $3 A Share," *Barron's*, Nov. 19, 2015 (emphasis added).

193.    All in all, SunEdison's Stock plunged by 83% during the second half of 2015, as investors became increasingly concerned about the Company's ability to finance its plans, according to *Bloomberg*.  In addition to the enormous decline of its stock price, the Company continued to experience other serious financial difficulties during the fall of 2015, including a dearth of liquidity, falling margins, and a reclassification of $739 million of its debt from "non-recourse" to "recourse."   However, throughout this time, despite the red flags concerning, *inter alia*, the Company's extraordinary debt and its ability to survive, raised by both the Company's own quarterly reports, as well as the financial press covering the Company, the Defendant-fiduciaries did nothing to investigate the prudence of Company Stock as an investment for retirement nor to protect the Plan Participants' interests invested in SunEdison Stock.

194.    The Company's struggles continued in 2016.  On January 7, 2016, SunEdison filed Form 8-K with the SEC, announcing pricing of $725 million of second lien secured term loans and

entry into a series of exchange agreements, through which SunEdison swapped its debt for a mix

of equity and new debt with a higher interest payment than the old debt did, resulting in $738

million debt restructuring.  However, SunEdison's desperate move to restructure its debt in an

effort to stay afloat did not succeed in propping up the Company Stock price, which has already

been declining for months during the preceding year (which went ignored by the Plan's

fiduciaries).  The same date of the debt restructuring announcement, it was reported that:

> Shares of the solar power semiconductor manufacturer are down over 40% following a series of complex moves that the company made to reduce debt.
>
> First of all, SunEdison is offering a new $725 million second lien loan that will be used to pay about $170 million on a second lien credit. Included in this loan are 28.7 million shares worth of warrants.
>
> Also, $580 million worth of notes will be traded for a $225 million note due in 2018, plus 28 million common shares. Finally, 11.8 million common shares are being traded for $158.3 million in preferred stock.
>
> This has triggered today's massive sell-off because how dilutive it is for investors. Unfortunately, diluting the stock seems like a necessary evil for SunEdison, which desperately needs to reduce its debt. However, no one was expecting the costs to be this high.

*See* "Why Is SunEdison Stock Crashing?," *Zacks Equity Research*, Jan. 7, 2016.

195.     Neither did SunEdison's January 7, 2016 announcement that it was restructuring

its debt stave off the analysts' concerns about the Company's ability to survive.  On the contrary,

more alarms concerning, *inter alia*, SunEdison's massive debt, liquidity risks, and ability to raise

more funds for project financing continued to sound in the financial press:

**Highlights of Debt Restructuring**

> SunEdison revealed that it is offering a $725 million second lien loan comprising of $500 million of A1 loans and $225 million of A2 loans. Both the loans, to mature on Jul 2, 2018, carry an interest rate of LIBOR+10%. The loan also includes 28.7 million shares worth of warrants.

This loan is part of its series of exchange agreements with certain holders of its Convertible Senior Notes due 2018, 2020, 2022 and 2025 and Perpetual Convertible Preferred Stock (the "2018 Notes," "2020 Notes," "2022 Notes," "2025 Notes," and "Preferred Stock," respectively).

The company intends to use part of the net proceeds to repay the existing $170 million second lien credit. The remaining will be utilized for the payment of interests, transaction costs and general corporate purposes.

Also, $580 million worth of notes will be traded for a $225 million note due in 2018, plus 28 million common shares. Finally, 11.8 million common shares will be traded for $158.3 million in preferred stock.

**What Triggered the Sell-off?**

According to *Bloomberg*, though the aforementioned deals will increase SunEdison's net debt position by $42 million, it will add $555 million to liquidity — a very positive strategy for a cash-strapped company.

Then what made investors sell the stock? The high cost SunEdison is incurring to enhance liquidity.

Citing Sven Eenmaa, an analyst at Stifel Financial Corp., *Bloomberg* revealed that the new transaction will increase SunEdison's annual interest expenses by about $40 million. The financial data provider also stated that this will dilute existing shareholders by approximately 18%.

**Conclusion**

*It is to be noted that SunEdison has been struggling to finance its projects due to the tremendous debt burden it incurred because of the string of buyouts, including First Wind and Solar Grid Storage, made over the past one year.*

The situation worsened in July last year when SunEdison entered into a definitive agreement to acquire Vivint Solar Inc. VSLR in a cash-stock deal worth $2.2 billion. The deal made investors increasingly cautious about its rising debt pressure.

These acquisitions, once believed to be strategic, are now burning a hole in SunEdison's pocket. The acquisitions have taken a toll on its balance sheet with total outstanding debt (including current portion) nearly doubling to $11.7 billion at the end of third-quarter 2015 from $6.3 billion a year ago.

*Although SunEdison has taken a series of initiatives*, such as lowering its offer price for the Vivint Solar buyout and quitting the development projects in Brazil, to improve the liquidity position, *we don't see any material impact on its balance sheet.*

> *Further, we believe that with the recent sell-off, it will become difficult for SunEdison to raise more funds for project financing. Therefore, as the going gets tough for the company, we would advise investors to stay away from this Zacks Rank #3 (Hold) stock for now.*

*See* "SunEdison Dives 39% on Complex Debt Restructuring Moves," *Zacks Equity Research*, Jan. 8, 2016 (emphasis added).

196.    Following SunEdison's January 7, 2016 debt restructuring announcement, it has been widely reported in the financial press, that the Company's financial prospects continue to look grim:

> *A move to reduce debt may tell us more about how much trouble SunEdison Inc is in than anything else.*
>
> On the surface, you wouldn't think a financial swap that reduces both long- and short-term debt would be a bad thing for a highly indebted company. But *for SunEdison Inc (NYSE: SUNE), the announcement that it was swapping debt for equity and a reduced amount of debt was met with scorn on Wall Stree*t. …
>
> The problem for SunEdison is that it got so indebted that creditors started demanding higher and higher interest rates. At the same time, the company was forced to pivot strategies to selling projects to third parties, which is lower margin than holding them on the balance sheet. *The combination of higher borrowing costs and lower margins may be too much for SunEdison to overcome*.
>
> **The thing with debt...**
>
> &ast;  &ast;  &ast;
>
> The problems with debt start to show if returns don't exceed the cost of debt. And *with $11.7 billion in debt, $7.9 billion of which is at the parent company, the cost of debt is high for SunEdison*.
>
> &ast;  &ast;  &ast;
>
> According to analyst Sven Eenmaa at Stifel Financial Corp., the exchange offer made on Thursday will actually increase interest expense annually by about $40 million because it exchanged low interest rate convertible debt for higher interest rate term debt. With this included, SunEdison's interest costs are about $276 million per year.
>
> &ast;  &ast;  &ast;

Just breaking even will be a challenge based on the numbers above, but it's possible with an expected 3.5 GW installed in 2016. The real problems start to emerge when you start looking at its future cost of debt.

…the $725 million term loans announced yesterday came with interest rates of LIBOR + 10%, or about 10.85% as of today at 6-month LIBOR rates.

*That's an insanely high interest rate compared to competitors* like First Solar and SunPower, who are paying LIBOR plus 3.5% or less on short-term debt. *Not only does that mean interest costs may be increasing further in the future, it make it harder for SunEdison to build projects with competitive financing structures versus competitors.*

*     *     *

The general theme here is that *SunEdison's business is moving toward the lower-margin business of selling projects to third parties at the same time its borrowing costs are trending higher. That's a slippery slope for any business, and it doesn't bode well for SunEdison, especially when it's competing against companies with much lower cost structures.*

As an investor, I'm staying far away from a high-risk company like SunEdison. It's possible the company survives all of these challenges, but *the path it's currently on is unsustainable*, and I think there's a lot more dilution and/or restructuring to be done before it gets out from under its messy financial situation.

*The history of highly indebted companies in renewable energy isn't good, and the path forward for SunEdison doesn't look like a profitable one for investors.*

"SunEdison Inc's Digging a Hole It May Never Get Out Of", *The Motley Fool*, Jan. 9, 2016 (emphasis added).

197.    Indeed, as the market did not react positively to SunEdison's debt restructuring maneuver announced on January 7, 2016, the value of the Plan's assets invested in SunEdison Stock continued to erode, reflecting the severe deterioration of SunEdison Stock's price:

…*24/7 Wall St.* has tracked five companies in which shareholders were destroyed last week.

*     *     *

*Investors pummeled SunEdison Inc. (NYSE: SUNE) after it restructured more of its debt this week, sending the share price down 46% at one point.* The

78

restructuring deal extinguishes about $580 million in convertible debt and $158.3 million in preferred stock. The so-called Second Lien Secured Term Loans are expected to close on January 11, and SunEdison expects to receive $725 million in cash. After paying off approximately $170 million on its existing second lien credit facility, SunEdison will retain $555 million for, among other things, general corporate purposes.

The transactions will dress up the company's balance sheet, but the price is very high, according to one analyst cited by *Bloomberg*. SunEdison's interest expense is likely to grow by $40 million a year and existing shareholders are being slapped with about 18% dilution to the value of their shares. Over the past week, the stock dropped roughly 30%. Shares of SunEdison closed at $3.41 late on Friday, with a consensus price target of $14.93 and a 52-week range of $2.55 to $33.45.

*See* "5 Stocks That Destroyed Shareholders This Past Week," *24/7 Wall St.com*, Jan. 9, 2016

(emphasis added).

198.   On January 12, 2016, as SunEdison Stock continued on its downward slide, it was

reported that:

*Gordon Johnson has doubts about SunEdison Inc (NYSE: SUNE)'s chances of making it through the year*.

Speaking Tuesday on PreMarket Prep, Johnson said he's concerned by the company's debt.

"SunEdison amassed a massive amount of debt... The majority of that debt was used to buy projects they intended to drop down into their yieldco," Johnson said, noting that SunEdison took on $10 billion in new debt from 2011-2015. "Essentially what happened is the yieldco story ended, and this was a company left with a lot of debt and a lot of projects which are extremely capital intensive. When the yieldco story fell apart, you didn't have that buyer of first resort."

The stock, which traded as high as $33.45 in July, was trading around $3 on Tuesday morning. The stock was briefly halted on a circuit breaker.

The question now, according to Johnson, is whether SunEdison can sell these projects in the third-party merchant market. It's been trying since the second quarter of 2015, yet so far haven't been able to sell outside its own warehouses and yieldcos.

This is the core of Johnson's worry: "Given the number of deals and the type of deals that they've done...if they're unable to sell those projects, *I don't know how much longer the equity can last*."

> *When asked if SunEdison's new financing deal was a good move, Johnson responded, "Absolutely not. I think this deal makes me more cautious on the company's ability to make it through 2016. . . ."*

*See* "Axiom's Gordon Johnson 'More Cautious' On SunEdison's Ability To Make It Through

2016," *Benzinga.com*, Jan. 12, 2016 (emphasis added).

199.   On January 12, 2016 alone, SunEdison Stock plummeted by 29% in mid-day

trading, and closed down 9.6 % further undermining the Company's ability to survive:

> *More concerns about high debt costs are hitting SunEdison and calling its future into question.*
>
> **What**: Shares of SunEdison Inc (NYSE: SUNE) fell as much as 29% mid-day on Wall Street Tuesday after another analyst questioned the company's long-term survival.
>
> **So what**: Analyst Gordon Johnson at Axiom Capital Management raised more concerns about the company's recent debt restructuring. Details of that restructuring can be seen here, but the short story is that SunEdison traded debt for a combination of equity and new debt that actually holds a higher interest payment than the old debt.
>
> What's concerning is that the restructuring came with debt that holds an interest rate in excess of 10%, incredibly high considering the fact that SunEdison bid aggressively to win projects on the idea that it had a low cost of capital. Johnson said on a podcast this morning, "*I don't know how much longer the equity can last*."
>
> **Now what**: *SunEdison has been in a downward spiral and it's a situation that will be almost impossible to get out of at this point.* The company needs low cost funding to build projects and needs new projects to pay for debt already on the balance sheet. With both working against the company there's not a likely scenario where it can get enough funding to dig out of its current hole. *For investors, the risk of bankruptcy sometime in the next year is too big to ignore and I see no reason to buy the stock now*.

*See* "Why SunEdison Inc's Shares Dropped Another 29% Today," *The Motley Fool*, Jan. 12, 2016

(emphasis added).

200.   SunEdison Stock hit a new 52-week trading low of $2.36 on January 12, 2016, closing at $3.02.  Summing up the serious issues plaguing the Company, one financial publication reported as follows:

> …Separately, recently, *TheStreet Ratings* objectively rated this stock according to its "risk-adjusted" total return prospect over a 12-month investment horizon. . . . *TheStreet Ratings* has this to say about the recommendation:
>
> **We rate SUNEDISON INC as a Sell with a ratings score of D**. This is driven by a few notable weaknesses, which we believe should have a greater impact than any strengths, and could make it more difficult for investors to achieve positive results compared to most of the stocks we cover.  **The company's weaknesses can be seen in multiple areas, such as its generally high debt management risk, generally disappointing historical performance in the stock itself and feeble growth in its earnings per share**.
>
> Highlights from the analysis by *TheStreet Ratings Team* goes as follows:
>
> **The debt-to-equity ratio is very high at 8.33 and currently higher than the industry average**, implying increased risk associated with the management of debt levels within the company.  **Along with the unfavorable debt-to-equity ratio, SUNE maintains a poor quick ratio of 0.76**, which illustrates the inability to avoid short-term cash problems.
>
> **Looking at the price performance of SUNE's shares over the past 12 months, there is not much good news to report: the stock is down 82.14%, and it has underperformed the S&P 500 Index. In addition, the company's earnings per share are lower today than the year-earlier quarter.**  Naturally, the overall market trend is bound to be a significant factor. However, in one sense, the stock's sharp decline last year is a positive for future investors, making it cheaper (in proportion to its earnings over the past year) than most other stocks in its industry. But due to other concerns, we feel the stock is still not a good buy right now.
>
> **SUNEDISON INC's earnings per share declined by 19.5% in the most recent quarter compared to the same quarter a year ago. The company has reported a trend of declining earnings per share over the past two years.** . . .

*See* "Here's Why SunEdison (SUNE) Stock Is Plummeting Today," *The Street*, Jan. 12, 2016 (emphasis added).

201.   On February 29, 2016, the Company admitted that its Audit Committee had been conducting an internal investigation since November 2015 or earlier when it filed with the SEC a

Form NT 10- K reporting that it would delay filing of its Form 10-K Annual Report.  SunEdison cited the activity of its Audit Committee as the reason for the delay, identifying "the need to complete all steps and tasks necessary to finalize the Company's annual financial statements" as well as "ongoing inquiries and investigations by the Audit Committee."

202.    In March 2016, SunEdison announced that the filing of its Annual Report on Form 10-K for the year ended December 31, 2015 with the SEC would be delayed beyond the extended due date of March 15, 2016.  The scope of work required to finalize the Company's financial statements included in the 2015 Annual Report on Form 10-K expanded due to the identification by management of material weaknesses in its internal controls over financial reporting, primarily resulting from deficient information technology controls in connection with newly implemented systems.  Because of these material weaknesses, additional procedures are necessary for management to complete the Company's annual financial statements and related disclosures, and for the Company's independent registered accounting firm, KPMG LLP, to finalize its audits of the Company's annual financial statements and the effectiveness of internal controls over financial reporting as of December 31, 2015.  In addition, an investigation by the Company's Audit Committee concerning the accuracy of the Company's anticipated financial position previously disclosed to the Company's Board was not finalized until April 2016.

203.    Incredibly, it was not until March 2016 that a blackout notice (the "Notice") was issued to its directors and executive officers informing them of a temporary suspension of contributions to the SunEdison Stock Fund in the Plan, as a result of the announced delayed filing of the Company's fiscal 2015 Annual Report on Form 10-K with the SEC.  By this time, the stock price was $1.50-$2.00 per share.  During the blackout period, Plan Participants were temporarily unable to invest contributions to the Plan in the SunEdison Stock Fund or transfer any amount

from any other investment option into the SunEdison Stock Fund. In a Form 11-K filed by the Plan on July 13, 2016, the Plan stated that the blackout period will continue until the Company has filed its 2015 Annual Report on Form 10-K and is current in its required SEC filings.

204.    In March 2016, SunEdison received a subpoena from the U.S. Department of Justice (the "DOJ") seeking information and documentation relating to: (a) certain financing activities in connection with the Company's acquisition of Vivint, (b) the conduct of a former non-executive employee who is alleged to have committed wrongdoing in connection with the Vivint termination negotiations, (c) the previously disclosed investigations by the Company's Audit Committee, (d) intercompany transactions involving the Company and each of TERP and Global and (e) the financing of the Company's Uruguay projects in connection with project costs and equity contributions that remain to be contributed by the Company and the DOJ may have additional requests. Also, the Company received a nonpublic, informal inquiry from SEC covering similar areas.

205.    In April 2016, SunEdison and certain of its subsidiaries filed a voluntary petition for relief (the "Bankruptcy Petition") under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under the caption *In re SunEdison, Inc.*, Case No. 16-10992 (the "Bankruptcy Case"). SunEdison stated that it intended to continue to operate its business as a "debtor-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and the orders of the Bankruptcy Court.

206.    In April 2016, SunEdison received a delisting notification (the "Delisting Notice") from the staff of NYSE Regulation (the "Staff"). The Delisting Notice advised the Company that, following the Company's announcement that it and certain of its domestic and international

subsidiaries had filed the Bankruptcy Petition under the Bankruptcy Code in the Bankruptcy Court, the Company's securities were subject to delisting from the New York Stock Exchange (the "NYSE").  The Delisting Notice noted that the common stock was suspended immediately from trading at the market opening on the NYSE on April 21, 2016.

207.     Accordingly, during the Relevant Period, SunEdison Stock was not a prudent investment option for the Plan Participants, in light of, *inter alia*, (a) the known material information regarding the Company's business and prospects; (b) poor historical performance of SunEdison Stock; (c) massive amounts of debt threatening the Company's ability to finance its projects and thereby the Company's survival; (d) the Company's rising debt-to-equity ratio; (e) the Company's likelihood of bankruptcy; (f) the Company's high debt management risk; and (g) the Company's losses as noted in SunEdison's quarterly reports.

## DEFENDANTS HAD A CONTINUING DUTY TO MONITOR THE SUITABILITY OF SUNEDISON STOCK IN THE PLAN BUT FAILED TO DO SO

208.     Under trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones.  This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset.  Here, the Investment Committee Defendants failed to monitor the SunEdison Stock Fund and remove it from the list of investment options within the Plan as it was clearly an imprudent investment option for the reasons stated below:

- In the spring of 2015, the Company took on massive debt consisting of $337 million in 3.75% Guaranteed Exchangeable Senior Secured Notes due 2020 (the "Exchangeable Notes") and a $410 million two-year loan (the "Margin Loan") in order to fund a new massive acquisition.  In repeated presentations and SEC filings, the Defendants categorized the Exchangeable Notes and the Margin Loan as "non-recourse" debt, meaning among other things that the lenders could not resort to the Company for repayment of the debt.  In reality, as investors learned months later in November 2015 when the Company abruptly re-categorized the debt in its public

filings, this $750 million in debt was actually recourse debt, with highly adverse repercussions for the Company's financial position.

• As early as mid-2015, global markets turned decisively against SunEdison and its growth strategy. And, as recognized by analysts reports (including the May 19, 2015 Avondale Partners article and August 31, 2015 J.P. Morgan North American Equity Research article), investor demand for energy stock was weak— with an increasingly negative shift in attitudes toward yieldcos.

• SunEdison's overall corporate debt rose from $7.2 billion at the end of 2014 to $10.7 billion by the end of the second quarter of 2015.

• On July 20, 2015, SunEdison announced in a press release that it had entered into a merger agreement with Vivint for $2.2 billion in cash, stock and convertible notes. By the time of the Vivint Solar Acquisition, the Company was already highly leveraged and in financial distress as evidenced by its quarterly reports discussed below. As such, SunEdison needed TERP'S liquidity and credit resources to help finance the Vivint Solar Acquisition. Consequently, SunEdison used its control over TERP (SunEdison retained over 90% of the voting power in TERP Power after its IPO) to compel TERP to purchase the assets that SunEdison was acquiring as part of its acquisition of Vivint. As alleged in a derivative action against SunEdison filed on behalf of TERP, *Appaloosa Investment Limited Partnership I[] v. SunEdison, Inc., et al.*, Case No. 11898 (Del. Ch. Jan. 12, 2016), unlike the traditional utility-scale projects that TERP acquired from SunEdison in the past, which involved credit-worthy counterparties and generated reliable cash flows, the residential rooftop solar assets that SunEdison was selling to TERP as part the Vivint Solar Acquisition, had individual homeowners as counterparties, reflecting significantly higher credit risk and lower reliability of cash generation.

• The market's negative reaction to the Vivint Solar Acquisition drove down SunEdison's stock price from $31.56 on the trading day (July 17, 2015) before the announcement of the Vivint Solar Acquisition compared to $26.01 per share by the end of the following week.

• Due to the chilled investor demand for Global's stock, SunEdison agreed to acquire $30 million of Global's Class A common stock in its IPO, which has been expected to be purchased by public investors.

• According to SunEdison's internal auditors and project managers, by July 2015, SunEdison's liabilities vastly eclipsed its revenue, and SunEdison was in a hiring freeze, despite its ostensible growth.

• Chatila and Wuebbels reassured investors in August 2015 that SunEdison had "greater than $1 billion" in ready cash available, leading analysts to comment positively that any liquidity concerns "appear [] more of a perception than a reality." In fact, as investors (which included Plan Participants) learned after April

2016, that $1 billion included a $500 million credit facility that "SunEdison couldn't access" and should never have been included in the presentations of the Company's liquidity, which meant that Defendants Chatila and Wuebbels overstated the Company's liquidity by 50%.

• On August 6, 2015, Wuebbels reassured investors that "we don't see any additional financings to be able to achieve this [expected] growth." But the Company had already been secretly negotiating with Goldman Sachs to take out a second lien one-year loan of $169 million, with an effective interest rate (including fees) of 15% (the "Goldman Sachs Loan"). The Company closed the Goldman Sachs Loan just four days after Wuebbels claimed the Company did not require "additional financings." When investors learned – months later – that the Company had been forced to take out this extraordinarily onerous loan, analysts stated that the "unusual" loan pointed to "emergency cash needs," as no borrower would be forced to take out a loan on such terms other than a "distressed company."

• From at least August 7, 2014, Defendants knew and internally discussed with SunEdison employees that the Company's liquidity was already seriously constrained. SunEdison, at the direction of Chatila and Wuebbels among others, and as a matter of undisclosed practice, routinely refused to pay critical vendors even when those vendors threatened to cease all services. As SunEdison later admitted in its Bankruptcy Proceeding, SunEdison's "[v]endors [we]re generally not interchangeable, and the risk of nonpayment could delay construction, risking significant loss in the value for SunEdison stakeholders."

• According to the complaints filed in the Whistleblower Actions, on August 27, 2015, Chatila and Wuebbels reported to the SunEdison Board that SunEdison would be cash negative in the fourth quarter of 2015 and the first quarter of 2016. Specifically, the entire Board was informed that SunEdison would have a "cash-burn rate" of $425 million in the fourth quarter of 2015 and a further net cash reduction of $32 million in the first quarter of 2016. Such information regarding SunEdison's cash shortfall, however, was concealed from the investing public.

• On September 2, 2015, in an interview published in *Bloomberg*, defendant Chatila reassured investors that SunEdison would "start generating cash for a living . . . . probably early 2016 or late 2015." As investors (and Plan Participants) learned after April 2016, just "[d]ays earlier, an internal presentation to SunEdison's board showed the company wouldn't have positive cash flow until at least the second quarter of 2016."

• According to the complaints filed in the Whistleblower Actions, between mid-September and October 2015, the entire Board was repeatedly informed of SunEdison's liquidity problems, including the finding by an investigation led by Domenech and Wuebbels that, by October 2015, SunEdison had only $342 million in unrestricted cash.

- In late October 2015, executives from the Company's controlled Yieldcos subsidiaries TERP and Global internally "raised concerns with SunEdison's Board about the extent of SunEdison's liquidity and the accuracy of SunEdison's public statements regarding its financial condition." Then, SunEdison's senior officials internally raised concerns to the SunEdison Board with concerns that "SunEdison was running out of money and wasn't being honest with investors about its financial problems."

- On October 8, 2015, according to the complaints in the Whistleblower Actions, Domenech and Perez met with defendants Hernandez and Tesoriere to discuss SunEdison's liquidity problems. At the meeting, Domenech and Perez demanded that the Board investigate SunEdison's liquidity problems and the accuracy of its financial statements. According to Domenech and Perez, the Board rebuffed their demand for a new investigation and instead, asked them to wait for the results of an "active" investigation led by defendant Blackmore, who acted as Hernandez's "sounding board" on the issue of SunEdison's liquidity.

- Following an October 26 Board meeting at which Chatila and Wuebbels made a presentation regarding SunEdison's liquidity problems, Domenech and Perez met or spoke separately with defendants Williams, Zwirn, and Blackmore regarding the liquidity problems. During these conversations, each of these Board members showed their knowledge of SunEdison's liquidity problems.

- In October 2015, Defendants knew the entire $349 million margin loan became mandatorily pre-payable and the Company did not have the funds to readily pay it.

- Chatila and Wuebbels claimed to investors (which included Plan Participants) in a November 9, 2015 conference call that the company had $1.4 billion in liquidity at the end of the third quarter. *The Wall Street Journal* ("*WSJ*") later reported on April 14, 2016 that, at the same time that these Defendants claimed that SunEdison had $1.4 billion in available liquidity, an internal non-public report circulated within SunEdison that day showed that the Company had only $90 million in available cash. According to the *WSJ*, discrepancies between the Company's public statements about its liquidity and its internal figures so troubled senior SunEdison officials that they **raised these concerns directly to the Company's Board of Directors**. They told the Board that "SunEdison was running out of money and wasn't being honest with investors about its financial problems." The allegations made by Domenech and Perez in the Whistleblower Actions confirm the *WSJ*'s account.

- Indeed, in November 2015, SunEdison's cash shortages were so severe that there was no way it could pay off the Margin Loan – as it was now required to do or risk cross default on $8 billion in debt – without drastic action. In what was later termed the "Friday Night Massacre," Chatila and Wuebbels exercised SunEdison's power to fire the YieldCo's senior executives (who had raised disclosure concerns

just weeks earlier), appoint defendant Wuebbels as CEO to the YieldCos, and reconstitute the YieldCo's Board-level conflicts committees to approve the purchase of assets in India called "the India Projects." This allowed SunEdison to take the money from YieldCo coffers – ostensibly for the India Projects – and pay off the Margin Loan with just minutes to spare.  As Global later detailed in a sworn complaint filed against its own parent, SunEdison, Defendants deceived Global's new Conflicts Committee by "misrepresenting SunEdison's liquidity," "omitting to disclose to Global and its Conflicts Committee material information known to them about SunEdison's liquidity," and "failing to correct material misstatements made to Global and its Conflicts Committee with respect to SunEdison's liquidity."  At the time, however, the Defendants issued a press release touting the new "streamlined" management and the acquisition of the India Projects as a "win-win" for both SunEdison and Global shareholders.

- On April 4, 2016, news emerged that Global (with the authorization of longstanding SunEdison Director Peter Blackmore) filed a lawsuit accusing SunEdison executives of "misrepresenting SunEdison's liquidity" and looting Global to cover up SunEdison's own financial weakness.

- SunEdison later admitted to the Bankruptcy Court on April 21, 2016 that: **"[I]n October 2015** the entire Margin Loan became mandatorily prepayable. This Prepayment, which amounted to $439 million, drained SunEdison's cash reserves and fundamentally changed its and the YieldCos' financial outlook."  (Emphasis added).

209.  The price of SunEdison Stock collapsed by 100% during the Relevant Period.  The Plan's losses would have been avoided, in whole or in part, had Defendants complied with their ERISA fiduciary duties, including, but not limited to: a) investigating, evaluating, and deciding whether SunEdison Stock was a prudent retirement investment in light of SunEdison's severe liquidity problems from the start of the Relevant Period; b) following proper disclosure, freezing or limiting additional purchases of SunEdison Stock by the Plan; and c) allowing for the orderly liquidation of the Plan's holdings of SunEdison Stock.

210.  The Plan suffered millions of dollars in losses because Defendants caused substantial assets of the Plan to be imprudently invested, or allowed Participants to remain invested in Company Stock during the Relevant Period, in breach of Defendants' fiduciary duties.  These losses were reflected in the diminished account balances of the Plan Participants.

211.    Defendants failed to actively monitor and assess whether an investment of retirement savings in SunEdison Stock was prudent, in light of the deteriorating financial condition of the Company and severe liquidity problems which presented a material risk of complete loss to the SunEdison Stock Fund.  As a consequence of Defendants' actions, regardless of any ability to divest, Participants did not exercise independent control over their investments in the SunEdison Stock Fund, and Defendants are liable under ERISA for losses caused by the investment in the SunEdison Stock Fund when it was imprudent to make such investments.

## SPECIAL CIRCUMSTANCES – PUBLIC INFORMATION

212.    Defendants breached their fiduciary duties when they completely ignored the public information regarding the financial stability of the Company ("Special Circumstances") that clearly indicated that SunEdison Stock was an imprudent investment for the Plan.  For example:

(a)    On May 19, 2015, Avondale Partners published an article warning that SunEdison's YieldCos "could prove to be more volatile than expected."

(b)    As early as mid-2015, global markets turned decisively against SunEdison and its growth strategy.

(c)    Within a week after the July 20, 2015 announcement of the Vivint Solar Acquisition, SunEdison's stock price dropped from $31.56 on July 17, 2015 to $25.55 on July 29, 2015.

(d)    The market's chilled reaction to Global's IPO required SunEdison to purchase $30 million of Global's Class A common stock in the IPO.

(e)    On October 8, 2015, Law360 reported that the shares of NRG Energy Inc.'s yieldco, a SunEdison competitor, plunged nearly 70% between June and October 2015.

(f)      On November 9, 2015, the market learned that the Company abruptly re-categorized the debt in its public filings and described the $750 million in debt as **_recourse_** **_debt_**, which had highly adverse repercussions for the Company's financial position.    In November 2015, SunEdison stock traded in a range of a high of $7.98 to a low of $2.82 per share.

(g)      In and around November 2015, SunEdison took desperate action later referred to as the "Friday Night Massacre." On the very day of the default deadline, November 20, 2015, Chatila and Wuebbels, and Martin H. Truong, the Company's Senior Vice President, General Counsel and Corporate Secretary, seized control of SunEdison's affiliates by reconstituting the YieldCos' boards so that they could use the assets of Global to pay SunEdison's debts.

(h)      On March 28, 2016, the market learned in a _Wall Street Journal_ article that the SEC had opened an investigation "into whether SunEdison overstated its liquidity [in the fall of 2015]" and that the Department of Justice ("DOJ") had opened a broad investigation into the Company's activities and public statements.  In March 2016, SunEdison stock traded in a range of a high of $2.13 to a low of $0.54 per share.

213.    The plethora of widely publicized information described above demonstrates that SunEdison Stock was not a prudent investment for retirement savings.  Therefore, Defendants should have stopped purchasing additional shares and divested the Plan of its current SunEdison Stock holdings after disclosing their reasons for doing so.

214.    Based on this publicly available information described above, the Investment Committee Defendants had available to them numerous options for actions they could have

undertaken in an effort to satisfy their fiduciary duties, including divesting the Plan of Company stock.

215.    Such actions based on public information would have prevented millions of dollars of losses for the Plan and would not have run afoul of the federal securities laws because these actions were based on public information.

216.    The Investment Committee Defendants' decisions respecting the Plan's investment in SunEdison Stock, under the circumstances alleged herein, constituted a breach of fiduciary duty because a prudent fiduciary acting under similar circumstances would have acted to protect Plan Participants from the substantial losses that SunEdison Stock posed during the Relevant Period.

217.    The Investment Committee Defendants breached their duties to prudently and loyally manage the Plan's assets by allowing the Plan to continue to hold shares of SunEdison Stock and to continue to purchase additional shares as this asset was not prudent in light of the financial crisis facing SunEdison.  During the Relevant Period, as discussed *supra*, these Defendants knew or should have known that SunEdison Stock was not a suitable and appropriate Plan investment.  Investment in SunEdison Stock during the Relevant Period clearly did not serve the Plan's purpose of encouraging savings, and in fact caused enormous monetary losses to the Plan and wiped out Participants' retirement savings.  During the Relevant Period, despite their knowledge of the imprudence of the investment, the Investment Committee Defendants failed to take any meaningful steps (and in fact took no steps) to protect the Plan Participants from the inevitable losses that they knew would likely occur because the stock was imprudent asset for retirement savings.

## DEFENDANTS' "NON-PUBLIC" INFORMATION

218.    As set forth above, Defendants also had "non-public" information available to them which indicated that the SunEdison Stock Fund was not a prudent investment for retirement savings.   Defendants had available to them numerous options for actions they could have undertaken in an effort to satisfy their fiduciary duties, without violating United States securities laws, including making appropriate disclosures of their intention to take action on behalf of Plan Participants.

219.    Defendants also could have divested the Plan of Company Stock.

220.    These actions would have saved the Plan millions of dollars.

221.    Defendants breached their duties to prudently and loyally manage the Plan's assets by allowing the Plan to hold shares of SunEdison Stock — even as it was an imprudent investment —and to purchase additional shares.  During the Relevant Period, Defendants knew or should have known that SunEdison Stock was not a suitable and appropriate Plan investment for retirement savings.   They also knew that once the insider information was disclosed, the Plan and its Participants would suffer dramatic losses to their retirement savings.

222.    Defendants could not have reasonably concluded that ceasing additional purchases of SunEdison Stock for the Plan would do more harm than good to the SunEdison Stock Fund and Plan by potentially causing a drop in SunEdison's stock price and concomitant drop in the value of the SunEdison Stock already held in the Fund and/or Plan.  Defendants had, even prior to the beginning of the Relevant Period, already observed a significant drop in the value of SunEdison Stock accompanied by a myriad of alarming facts as the set forth above.

223.    As of July 2015, the Plan held fewer than approximately 800,000  shares of SunEdison Stock, or less than one half of one percent (0.3%) of all shares outstanding.  Officers

and Directors held, in aggregate, 1.4 million shares, or approximately 04% of the outstanding shares.   The top ten institutional shareholders, consisting largely of private investment funds and mutual funds, held 43.5% of the outstanding common shares, or 137.0 million shares.   The remaining 55.8% of the shares were held by other reporting institutions and retail investors .   Relative to all other shareholder categories, the Plan held significantly fewer shares at the beginning of the Relevant Period.



224.    The number of shares held by the Plan was also miniscule when compared to small fraction of the reported trading volume for the SunEdison Stock.   The graph below shows that on average the Plan's shares were just 3% of the *daily* trading volume.   The average *weekly* trading volume for SunEdison Stock during the period July 20, 2015 through April 20, 2016 was

approximately 233 million shares.  At approximately 1 million shares, the Plan shares were less

than one half of one percent (0.4%) of the weekly trading volume.



As SunEdison's financial condition continued to deteriorate throughout the Relevant, continuing

Stock Fund purchases for the Plan became even more damaging.    In this context, no reasonable

fiduciary could conclude that freezing new investment in SunEdison Stock in the Plan and the

orderly divestment of the Plan's SunEdison Stock, which represented a very small fraction of the

outstanding shares of this very widely traded stock, would have caused more harm than good.  The

alternative – *i.e.* doing nothing as the stock plummeted, resulted in a complete loss to Plan

Participants.  Even assuming, hypothetically, that SunEdison Stock would have dropped a material

amount in reaction to the Plan's disclosure of its decision to freeze purchases and divest – a highly

debatable proposition at best and more appropriate for expert testimony – any such decline would

have been less than a total loss of the Plan's investment. .  As demonstrated in the chart in ¶ 240,

it is economically inconceivable that any action to discontinue stock purchases for the Plan and redirect investments to the other Plan alternative, would have resulted in more harm than the total loss of investment that the Plan ultimately sustained.

225.    During the Relevant Period, when Plaintiffs allege the Plan should have been divesting of the SunEdison Stock Fund, the Plan was a net *purchaser* of units in the SunEdison Stock Fund.  On a common share equivalent basis, ownership of SunEdison stock increased from approximately 800,000 shares to 1,350,000 shares between July 2015 and April 2016.  At the same time, reporting institutional investors were dumping SunEdison Stock.  During the quarter-end period beginning June 30, 2015 through March 31, 2016, institutional investors divested of 176 million shares.[12]  Net sales in the quarter ended September 30, 2015 totaled 24.7 million shares. In the quarter ended December 31, 2015, net sales of SunEdison stock by institutional investors totaled 75.6 million shares.  During the period July 1, 2015 through March 31, 2016, the largest net sellers included, as follows:

---

[12]     Source:  S&P CapitalIQ.

| Reporting Institutions That Were Net Sellers of >3 Million SunEdison Shares | Net Change 6/30/15 - 3/31/16 |
|---|---|
| Wellington Management Group LLP | (12,843,551) |
| Third Point LLC | (12,400,000) |
| Glenview Capital Management, LLC | (11,403,277) |
| Lone Pine Capital LLC | (9,663,802) |
| Fred Alger Management, Inc. | (8,758,755) |
| Fir Tree Partners | (8,700,769) |
| Steadfast Capital Management LP | (8,577,740) |
| Omega Advisors, Inc. | (8,473,571) |
| SRS Investment Management, LLC | (6,714,986) |
| Emerging Sovereign Group, LLC | (6,097,949) |
| York Capital Management | (5,942,661) |
| Van Eck Associates Corporation | (5,567,845) |
| Canyon Capital Advisors, LLC | (4,822,636) |
| Valinor Management, LLC | (4,708,873) |
| Criterion Capital Management, LLC | (4,615,742) |
| Indus Capital Partners, LLC | (4,435,603) |
| Pennant Capital Management, LLC | (4,257,635) |
| GreenLight Capital, Inc. | (3,790,415) |
| Norges Bank Investment Management | (3,750,584) |
| Millennium Management LLC | (3,463,765) |
| Balyasny Asset Management L.P. | (3,272,282) |
| KKR Prisma | (3,242,363) |
| Point72 Asset Management, L.P. | (3,084,726) |

226.   At least three (3) major companies discontinued participant investment in the company stock fund for their Defined Contribution Plans during the Relevant Period, including Discover Financial Services, Xerox Corp., and Allegion plc.   It does not appear that the discontinuation of investment, nor the divestiture of the stock fund, caused any significant disruption in the stock price, thus causing "no more harm than good."





227.    In sum, Defendants, who were the fiduciaries of the Plan, breached their fiduciary obligations to Plan Participants by failing to monitor the investment and take action to prevent a total loss of Plan assets invested in the SunEdison Stock Fund.

### PROTECTIVE ACTIONS DEFENDANTS COULD HAVE TAKEN REGARDING THE PLAN'S ASSETS INVESTED IN SUNEDISON STOCK DURING THE RELEVANT PERIOD

228.    The Relevant Period begins on July 20, 2015 because at least by then, Defendants should have been aware that investment in SunEdison Stock was no longer prudent for the Plan.

229.    Rather than do nothing (as they did), Defendants should have taken numerous steps with regard to the Plan's assets invested in SunEdison Stock to fulfill their fiduciary duties to the Plan under ERISA.  As set forth more fully below, none of these steps (a) would have violated securities laws or any other laws, or (b) would have been more likely to harm the SunEdison Stock Fund than to help it.

230.    Defendants should have monitored the SunEdison Stock Fund and assessed the appropriateness of the Plan's investment in light of the Company's deteriorating business prospects and liquidity constraints, which heighted the Company's risk profile in excess of that appropriate for a retirement savings vehicle.

231.    Defendants should have frozen new investments in SunEdison Stock Fund for Plan Participant contributions, after making the proper disclosure of such action.

232.    Defendants also should have undertaken an orderly divestment of the SunEdison Stock Fund held by the Plan, and redirected the proceeds into other investment options available to Plan Participants during the Relevant Period.

233.    None of these actions would have implicated, let alone been in violation of, federal securities laws or any other laws.  Further, none would have caused the Plan more harm than was ultimately suffered due to a complete loss in value of the SunEdison Stock.

234.    Further, Defendants also could have: (a) sought guidance from the DOL or SEC as to what they should have done; and (b) resigned as Plan fiduciaries to the extent they could not act loyally and prudently; and/or retained outside experts to serve either as advisors or as independent fiduciaries specifically for the SunEdison Stock Fund.

**DISCONTINUING INVESTMENT IN SUNEDISON
STOCK WOULD NOT HAVE DONE MORE HARM THAN GOOD**

235.    Discontinuing investment in Company Stock would not have done more harm than good.  First, any announcement by the Plan or Defendants that the Plan was discontinuing the option of investment in Company Stock for Plan Participants would not have materially affected SunEdison's Stock price given the fact that there was already a plethora of news in the public domain as of the start of the Relevant Period indicating major and substantial problems at SunEdison.

236.    For example, as noted above, by August 7, 2015, SunEdison Stock's price had already dropped to $17.08, whereas it had traded over $31.00 prior to the announcement of the Vivint Solar Acquisition.   That same day, SunEdison issued a press release announcing its financial results for the 2015 second quarter, *reporting a loss of $263 million*.   The Company sustained a net loss of $0.93 per share.  SunEdison also reported that gross margins on the projects that the Company had sold to TERP were only 12.5%, a drastic cut from SunEdison's prior guidance of 18%.   Furthermore, according to its financials, SunEdison's debt now stood at a whopping $11 billion, which included debt from a number of multi-billion dollar deals to acquire new wind and solar assets.

237.    Since Defendants themselves had already disclosed this material information to the market on August 6, 2015 concerning SunEdison's whopping loss of $231 million, and since the stock had dropped from $31 to $17 from the time of the announcement of the Vivint acquisition on July 20, 2015, any announcement by the Plan or Defendants that the Plan was discontinuing the option of Plan Participants investing in Company Stock would not have had any, or only *de minimis*, further effect on the stock price.

238.    Thus, since there would have been no or only *de minimis* effect on SunEdison's Stock price had Defendants disclosed an intent to discontinue the Plan Participants' option of investing in SunEdison Stock at the beginning of the Relevant Period, avoiding future contributions to SunEdison Stock would not have caused more harm than good to Plan Participants than continuing to allow contributions to SunEdison Stock since Plan Participants would have avoided further substantial losses in SunEdison Stock, which eventually declined to zero when it was delisted by the stock exchange in the spring of 2016.

239.    Moreover, Plan Participants would not have suffered more harm than good from the discontinuance of SunEdison Stock as an investment option in the Plan because the alternative investments available in the Plan substantially outperformed SunEdison Stock from the beginning of the Relevant Period through the Chapter 11 filing date in April 2016.  The following chart from the Plan's Form 11-K filed on July 13, 2016 identifies the investment options available in the Plan as of 12/31/15:

Schedule of Assets Held for Investment Purposes at End of Year
Form 5500 – Schedule H – Item 4i December 31, 2015

| Identity of issuer, borrower, lessor or similar party | Description of issue, maturity date, rate of interest, collateral, par or maturity value | Current value |
|---|---|---|
| **  Vanguard Institutional Index | Mutual Fund | $      23,833,284 |
| **  Standard Stable Asset Fund | Group Annuity | 22,888,086 |
| **  Thornburg International Value R5 | Mutual Fund | 18,143,757 |
| **  American Beacon Large Cap Value | Mutual Fund | 13,288,514 |
| **  JP Morgan Large Cap Growth | Mutual Fund | 11,523,699 |
| **  Metropolitan West Total Return Bond I | Mutual Fund | 10,660,759 |
| **  Eagle Small Cap Growth | Mutual Fund | 8,409,841 |
| **  Eaton Vance Atlanta Capital | Mutual Fund | 8,186,335 |
| **  Goldman Sachs Small Cap Value | Mutual Fund | 8,167,928 |
| **  T. Rowe Price Capital Appreciation | Mutual Fund | 6,683,322 |
| **  JP Morgan Mid Cap Value | Mutual Fund | 5,775,867 |
| **  SunEdison Stock Fund* | Common Stock | 4,979,417 |
| **  Brokerage Securities | Brokerage | 4,440,737 |
| **  Vanguard Total Bond Market Index Fund | Mutual Fund | 3,918,468 |
| **  Prudential Inc. Flex Target | Mutual Fund | 423,368 |
| **  SecurePath for Life 2025 | Pooled Separate Account | 108,557 |
| **  SecurePath for Life 2020 | Pooled Separate Account | 48,320 |
| **  Cash Reserve Account* | Cash | 5,126 |
| **Total investments** | | $    151,485,385 |

240.    The chart below shows the investment performance of SunEdison Stock relative to an index of the other Plan investments that represent more than 5% of the total asset value of the

Plan from beginning of the Relevant Period through the date of the bankruptcy.



241.    As these facts demonstrate, Plan Participants who invested $100 in SunEdison Stock on July 20, 2015 would have lost all but $1.47 of their investment as of April 16, 2016. The same investment in the above alternative investment options lost only $2.17.

### THE RELEVANT LAW:  CLAIMS FOR RELIEF UNDER ERISA

242.    ERISA requires that every plan name one or more fiduciaries who have "authority to control and manage the operation and administration of the plan."   ERISA § 1102(a)(1). Additionally, under ERISA, any person or entity, other than the named fiduciary that in fact performs fiduciary functions for the Plan is also considered a fiduciary of the Plan.  A person or entity is considered a Plan fiduciary to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

243.   At all relevant times, Defendants are/were and acted as fiduciaries within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

244.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

245.   ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

246.   ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

247.     These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the highest known to the law and entail, among other things:

> •     the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;
>
> •     the duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;
>
> •     the duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

248.     Accordingly, if the fiduciaries of a plan know, or if an adequate investigation would reveal, that an investment option is no longer a prudent investment for that plan, then the fiduciaries must disregard any plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other, suitable, prudent investments.

249.     ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

250. Plaintiffs therefore bring this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## REMEDIES FOR BREACHES OF FIDUCIARY DUTY

251. As noted above, as a consequence of Defendants' breaches, the Plan suffered significant losses.

252. ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan…." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

253. Plaintiffs, the Plan, and the Plan Participants are therefore entitled to relief from Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

254. Each Defendant is jointly and severally liable for the acts of the other Defendants as a co-fiduciary.

## COUNT I

### FAILURE TO PRUDENTLY MANAGE THE PLAN'S ASSETS
### (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404(a)(1)(B) AND 405 BY THE INVESTMENT COMMITTEE DEFENDANTS)

255.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

256.    This Count alleges fiduciary breaches against the Investment Committee Defendants (the "Prudence Defendants") for failing to do a proper investigation into the continued prudence of investing Plan assets in Company Stock and for continuing to allow the investment of the Plan's assets in SunEdison Stock throughout the Relevant Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle because the Company's investment risk profile had been so dramatically altered due to its failing business prospects that it was no longer a prudent retirement investment.

257.    At all relevant times, as alleged above, the Prudence Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan and/or disposition of the Plan's assets.

258.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that all investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  The Prudence Defendants were responsible for ensuring that all investments in Company Stock in the Plan were prudent.  The Prudence Defendants are liable for losses incurred as a result of such investments being imprudent.

106

259. Upon information and belief, Defendants failed to engage in a reasoned decision-making process regarding the prudence of SunEdison Stock. An adequate investigation by Defendants would have revealed to the Prudence Defendants that investment by the Plan in SunEdison Stock was clearly imprudent during the Relevant Period. A prudent fiduciary acting under similar circumstances would have acted to protect Plan Participants against unnecessary losses, and would have made different investment decisions.

260. The Prudence Defendants breached their duties to prudently manage the Plan's assets invested in SunEdison Stock. During the Relevant Period, the Prudence Defendants knew or should have known that, as described herein, SunEdison Stock was not a suitable and appropriate investment for the Plan. Yet, during the Relevant Period, despite their knowledge of the imprudence of the investment, the Prudence Defendants failed to take any meaningful steps to protect Plan Participants from losses stemming from the Plan's investment in SunEdison Stock.

261. The Prudence Defendants further breached their duty of prudence by failing to divest the Plan of Company Stock during the Relevant Period, and/or by ceasing additional purchases of Company Stock, when they knew or should have known that it was not a suitable and appropriate investment for the Plan.

262. The Prudence Defendants also breached their duty of prudence by failing to provide complete and accurate information regarding SunEdison's true financial condition and, generally, by conveying inaccurate information regarding the Company's future outlook. During the Relevant Period, upon information and belief, Defendants portrayed a positive attitude toward the Company despite contrary information. As such, Plan Participants could not appreciate the true risks presented by investments in Company Stock, and therefore could not make informed decisions regarding their investments in the Plan.

107

263.     As a result of Defendants' knowledge of and, at times, implication in, creating and maintaining public misconceptions concerning the true financial health of SunEdison, any generalized warnings of market and diversification risks that Defendants made to the Plan Participants regarding the Plan's investment in SunEdison Stock did not effectively inform the Plan Participants of the past, immediate, and future dangers of investing in Company Stock.

264.     The Prudence Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plan from inevitable losses.  The Prudence Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy them.

265.     As a direct and proximate result of the breaches of fiduciary duties during the Relevant Period alleged herein, the Plan and, indirectly, the Plan Participants lost a significant portion of their retirement investments.  Had the Prudence Defendants taken appropriate steps to comply with their fiduciary obligations during the Relevant Period, the Plan could have liquidated some or all of its holdings in Company Stock, and/or not have purchased additional imprudent SunEdison Stock, and thereby eliminated, or at least reduced, the losses to Plan Participants.

266.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

**BREACH OF DUTY OF LOYALTY (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404(a)(1)(A) AND 405 BY THE DIRECTOR DEFENDANTS, AND INVESTMENT COMMITTEE DEFENDANTS)**

267.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

268.    This Count alleges fiduciary breaches against the Director Defendants and Investment Committee Defendants (the "Loyalty Defendants") for continuing to allow the investment of the Plan's assets in SunEdison Stock throughout the Relevant Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle because (the Company's basic risk profile had been so dramatically altered due to changed circumstances that it was no longer a prudent retirement investment.

269.    At all relevant times, as alleged above, the Loyalty Defendants were fiduciaries of the Plan within meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

270.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty; that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

271.    The duty of loyalty includes the duty to speak truthfully to the plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.  As the Supreme Court "succinctly explained" in *Varity Corp. v. Howe*, 516 U.S. 489 (1996), "[l]ying is inconsistent with the duty of

loyalty owed by all fiduciaries." *Maez v. Mountain States Tel. & Tel. Inc.*, 54 F.3d 1488, 1499 (10th Cir. 1995) (citing *Varity Corp.,* 516 U.S. at 506).

272.    During the Relevant Period, the Loyalty Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*:  failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in Company Stock; and by otherwise placing their own and/or the Company's interests above the interests of the Plan Participants with respect to the Plan's investment in the Company's securities.

273.    During the Relevant Period, upon information and belief, certain Defendants, including the Director Defendants, made direct and indirect communications with the Plan Participants in which they omitted or misrepresented information regarding or materially related to investments in Company Stock.  These communications included, but were not limited to, SEC filings, town hall meetings with Company employees, including the Plan Participants, press releases, and Plan documents (including Summary Plan Descriptions).  Defendants, including the Director Defendants, also acted as fiduciaries to the extent of this communication activity.

274.    Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan Participants, well-recognized in the 401(k) literature and the trade press[13] concerning employees' natural bias toward investing in company stock, including that:

---

[13]    *See, e.g.*, David Blanchett, CFA, CFP, Morningstar Investment Management, "Employer Stock Ownership in 401(k) Plans and Subsequent Company Stock Performance," July 1, 2013 at 7; David K. Randall, *Danger in Your 401(k)*, Forbes.com (August 30, 2010), *available at*: www.forbes.com/forbes/2010/0830/health-retirement-savings-erisa-danger-in-401k_print.html); Liz Pulliam Weston, *7 Ways to Mess Up Your 401(k)*, MSN.com (December 31, 2007), *available at*:   articles.moneycentral.msn.com/RetirementandWills/InvestForRetirement/7Most   Common

- Out of loyalty, employees tend to invest in company stock;

- Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

- Employees tend not to change their investment option allocations in the plan once made; and

- Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk.

275.     Knowing of these natural biases toward investment of Company Stock, Defendants should have been on high alert to protect the interests of the Plan Participants.  Defendants, however, disregarded their duties of loyalty to the benefit of the Company as demonstrated by the Plan's substantial investment of its assets in Company Stock, which goes against the grain of best investment practices.

276.     Because at least some of the Defendants were compensated in SunEdison Stock and owned SunEdison Stock, these Defendants had a conflict of interest which put them in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan Participants, whose interests Defendants were obligated to loyally serve with an "eye single" to the Plan.  *See generally Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251-52 (1993);

---

401kBlunders.aspx); Joanne Sammer, *Managed Accounts: A new direction for 401(k) plans*, Journal of Accountancy, Vol. 204, No. 2 (August 2007), *available at*: www.aicpa.org/pubs/jofa/aug2007/sammer.htm); Roland Jones, *How Americans Mess Up Their 401(k)s*, MSNBC.com (June 20, 2006), available at:  www.msnbc.msn.com/id/12976549/); Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001), *available at*: mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plan - the importance of plan design*, Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.), *available at*: www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf ).

29 U.S.C. § 1104(a)(1)(B).  These Defendants abandoned their duties to the Plan and its Participants, and failed to consider at any time during the Relevant Period what was in the best interest of the Plan and its Participants as they should have done as Plan fiduciaries.

277.  The Loyalty Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plan from inevitable losses.  The Loyalty Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy them.

278.  As a consequence of the Loyalty Defendants' breaches of fiduciary duty during the Relevant Period by putting the interests of themselves and the Company ahead of the Plan and its participants, the Plan suffered substantial losses, as its holdings of Company Stock were devastated.  If the Loyalty Defendants had discharged their fiduciary duties to loyally manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and, indirectly, Plaintiffs and the Plan's other participants, lost a significant portion of their retirement investments.

279.  Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

**FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES AND PROVIDE THEM WITH ACCURATE INFORMATION – (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 BY THE COMPANY, THE DIRECTOR DEFENDANTS AND THE INVESTMENT COMMITTEE DEFENDANTS)**

280.  Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

281.    This Count alleges fiduciary breaches against the Director Defendants, and the Investment Committee Defendants (the "Monitoring Defendants").

282.    At all relevant times, as alleged above, the Monitoring Defendants were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

283.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of other Plan fiduciaries.

284.    Under ERISA, a monitoring fiduciary must ensure that monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of a plan's assets, and must take prompt and effective action to protect the plan and participants when they are not.

285.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to the plan's participants or for deciding whether to retain or remove them.

286.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan's

assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

287.    During the Relevant Period, the Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

•    failing, at least with respect to the Plan's investment in Company Stock, to properly monitor their appointee(s), to properly evaluate their performance, or to have any proper system in place for doing so, and standing idly by as the Plan suffered significant losses as a result of the appointees' imprudent actions and inaction with respect to Company Stock;

•    failing to ensure that the monitored fiduciaries appreciated the true extent of the Company's precarious financial situation and the likely impact that financial failure would have on the value of the Plan's investment in Company Stock;

•    to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets and, in particular, the Plan's investment in Company Stock; and

•    failing to remove appointees whose performance was inadequate in that they continued to permit the Plan to make and maintain investments in the Company Stock despite the practices that rendered it an imprudent investment during the Relevant Period.

288.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided.

289.     The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by those Defendants, and they failed to make any effort to remedy these breaches despite having knowledge of them.

290.     Therefore, as a direct and proximate result of the breaches of fiduciary duty by the Monitoring Defendants during the Relevant Period alleged herein, the Plan and, indirectly, the Plan Participants, lost substantial retirement savings.

291.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs request the following relief:

A.     A Judgment that the Defendants, and each of them, breached their ERISA fiduciary duties to the Plan Participants during the Relevant Period;

B.     A Judgment compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.     A Judgment imposing a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.      A Judgment awarding actual damages in the amount of any losses the Plan suffered, to be allocated among the Plan Participants' individual accounts in proportion to the accounts' losses;

E.      A Judgment requiring that Defendants allocate the Plan's recoveries to the accounts of all Plan Participants who had any portion of their account balances invested in SunEdison Stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price of SunEdison Stock;

F.      A Judgment awarding costs pursuant to 29 U.S.C. § 1132(g);

G.      A Judgment awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.      A Judgment awarding equitable restitution and other appropriate equitable monetary relief against the Defendants.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: August 28, 2017

/s/ Robert I. Harwood
Robert I. Harwood
Daniella Quitt
**HARWOOD FEFFER LLP**
488 Madison Ave., 8th Floor
New York, NY 10022
Telephone: 212-935-7400
rharwood@hfesq.com
dquitt@hfesq.com

***Interim Lead Counsel for ERISA Plaintiffs***

**GAINEY MCKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, New York 10016
Telephone: 212-983-1300

tjmckenna@gme-law.com
egleston@gme-law.com

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr.
Albert Y. Chang
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone: 858-914-2001
fbottini@bottinilaw.com
achang@bottinilaw.com

**LEVI & KORSINSKY LLP**
Nancy Kulesa
30 Broad Street, 24th Floor
New York, NY 10004
Telephone: 212-363-7500
nkulesa@zlk.com

***Executive Committee for the ERISA Plaintiffs***